## COMMONWEALTH vs. LEONARD WESTMORELAND.

Suffolk.   December 7, 1982. — March 3, 1983.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Assistance of counsel.   *Constitutional Law,* Assistance
of counsel, Admissions and confessions, Waiver of constitutional
rights.   *Insanity.   Homicide.   Waiver.   Evidence,* Admissions and
confessions, Photograph, Relevancy and materiality.

Where defense counsel at a murder trial had presented the three defenses
of insanity, mental impairment, and provocation, and where the evi-
dence would have warranted the jury in finding either that the defend-
ant lacked criminal responsibility or that, by reason of mental impair-
ment, he lacked capacity to premeditate the killing, defense counsel's
closing argument which, in effect, abandoned these viable defenses,
denied the defendant his right to effective assistance of counsel and
necessitated a new trial. [271-275]
The circumstances of a criminal defendant's questioning by police, in-
cluding his decision to answer certain questions but not to answer
others, and his inquiry whether he should sign his statement, indicated
that he understood his right to remain silent and warranted the trial
judge's finding that the defendant had waived this right. [275-278]
At a murder trial, the admission in evidence of four autopsy photographs
of the victim's body, which had relevance to the issue whether the
crime was committed with extreme cruelty or atrocity, was within the
judge's discretion. [279]
A bloodstained knife found at the scene of the murder was properly ad-
mitted in evidence at a murder trial, where there was other evidence
from which the jury could infer that the blood on the knife was that of
the victim. [279]
Testimony by a psychiatric witness at a murder trial was in accordance
with the standards set forth in *Commonwealth* v. *McHoul,* 352 Mass.
544 (1967), and did not infringe upon the province of the jury. [280]

INDICTMENT found and returned in the Superior Court
Department on March 12, 1980.
The case was tried before *Abrams,* J.

*Elizabeth A. Lunt* for the defendant.

*Michael J. Traft,* Assistant District Attorney (*Paul J. Mc-Callum,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

NOLAN, J. The defendant appeals from a conviction of murder in the first degree and argues, inter alia, that he is entitled to a new trial because he was denied effective assistance of counsel. We agree.

The jury could have found the facts to be as follows. In July of 1978, the defendant and the victim established a residence together in Chelsea. Sometime thereafter the victim's two children moved in with their mother and the defendant. In December these four individuals moved to a third floor apartment at 12 Lynn Street in Chelsea. The defendant and the victim argued frequently; at least one such argument left the victim with a black eye. In January, 1979, a judge of the Boston Juvenile Court ordered the two children transferred to foster care.

Throughout the greater part of 1979 the defendant and the victim lived together. In December of 1979, the victim left the defendant and moved in with her grandfather in Boston. In January of 1980, the victim gave birth to a baby whose father is the defendant. However, the Department of Social Services obtained custody of the child before the baby left the hospital. In February, the victim obtained a temporary restraining order under G. L. c. 209A enjoining the defendant from physically and mentally abusing the victim and ordering him to stay away from the victim. However, after the issuance of this court order, the victim and the defendant spent considerable time together.

On the night of March 4, 1980, the victim was seen running down the outside stairs at 12 Lynn Street onto the sidewalk. She was naked, bleeding from her mouth, and screaming for help. The defendant was seen following her down the stairs. The defendant attempted to drag the victim across the sidewalk. The defendant stabbed the victim with a knife seven or eight times as she lay on the sidewalk. The defendant walked back up the porch steps. At this

point, the defendant passed Bernice Radzikowski, who lived in the same building, and said to her, "Go upstairs. She's going to be all right." Within minutes the defendant came back down the stairs, leaned over the victim, and stabbed her four or five more times with a different knife. He then stood up, wiped off two or three knives with a cloth, threw these knives into different sections of a neighbor's yard, and dropped the cloth on the sidewalk. Chelsea police apprehended the defendant as he crossed Central Avenue less than a block from the scene.

After an eight-day trial, the jury returned a verdict of guilty of murder in the first degree. The judge sentenced the defendant to life imprisonment at the Massachusetts Correctional Institution, Walpole.

1. *Effective Assistance of Counsel.*

The defendant contends that he was denied his constitutional right to effective assistance of counsel because trial counsel, in his closing argument to the jury, deprived him of an insanity defense based on *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967), and did not argue a mental impairment defense based on *Commonwealth* v. *Gould,* 380 Mass. 672 (1980). We agree and order a new trial.

In this case the defendant's trial counsel proceeded with three principal defenses: insanity, mental impairment, and provocation. Three witnesses testified that the defendant repeatedly stabbed the victim while she was lying helpless on the sidewalk. According to the testimony of the pathologist, the victim received approximately forty-five stab wounds in various parts of her body. A psychiatrist called by the defendant testified that, at the time of the attack on the victim, the defendant was suffering from a mental defect — specifically, an antisocial personality disorder. Moreover, this expert testified that because of this defect the defendant lacked substantial capacity to conform his conduct to the requirements of the law.[1] There was also expert

---

[1] A psychiatrist called by the Commonwealth testified that the defendant was not suffering from a mental disease or defect which would impair

testimony from which the jury could infer that the defendant did not have the capacity deliberately to premeditate his acts.

The defendant took the stand and gave the following account of the events which culminated in the victim's death. During a conversation between the defendant and the victim, the victim stabbed herself with a knife. The defendant tried to grab the knife and pull it out of the victim's body but could not do so because she was gripping the knife in her hands. He slapped the victim and the knife came out. At this point the defendant attempted to stop the bleeding by placing the victim in a bathtub with cold water running. He subsequently took her out of the bathtub and placed the victim on a mattress in the living room. The defendant's memory becomes less clear at this point. He remembers that the victim threw a knife at him, missing him. She then ran out of the apartment to the sidewalk. As to the events which took place on the sidewalk, the defendant remembers only that the victim tried to stab him. He does not recall stabbing the victim. He does not recall bringing any weapons out of the apartment. The next thing he remembers is standing over the victim confused and unable to recognize the body as being that of the victim. His memory does not come into focus again until he is at the police station.

In closing argument, however, defense counsel said to the jury: "Now, Mr. Foreman, ladies and gentlemen of the jury, I'm not a smart guy. I'm a Chelsea street guy. I don't know about these psychiatric things. I just know I can conform my conduct and I know that Westmoreland didn't conform his. Temporary insanity? That's for you. Maybe not. Probably not. I don't think you're going to buy that . . . ." He did not mention the defense of mental impairment based on *Gould*.[2] Rather, he argued for a verdict of

his capacity to conform his conduct to the requirements of the law or would cause him to be incapable of appreciating the wrongfulness of his acts.

[2] We note that the judge instructed the jury as to criminal responsibility and mental impairment.

guilty of voluntary manslaughter although there was no evidence of provocation.

In *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), we held that an appellate court must examine "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." Accord *Commonwealth* v. *Street, post* 281 (1983); *Commonwealth* v. *Levia,* 385 Mass. 345, 352 (1982); *Commonwealth* v. *Key,* 381 Mass. 19, 31-32 (1980); *Commonwealth* v. *Daigle,* 379 Mass. 541, 544 (1980). We will not reverse a conviction on this ground unless the defendant demonstrates "that better work might have accomplished something material for the defense." *Commonwealth* v. *Adams,* 374 Mass. 722, 727 (1978), quoting *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977). Accord *Commonwealth* v. *Dalton,* 385 Mass. 190, 195 (1982).

There was sufficient evidence which, if believed, would have warranted the jury in returning a verdict reflecting their belief that the defendant was not criminally responsible. Counsel's withdrawal from the jury of the consideration of the issue of criminal responsibility, standing alone, is sufficient to require a new trial. Further, counsel compounded the error by disavowing a *Gould* defense. In *Commonwealth* v. *Gould,* 380 Mass. 672 (1980), we held that a jury should consider a defendant's mental illness as it might bear on his capacity for deliberate premeditation. 380 Mass. at 681-682. We also held in that case that, on the factual issue whether a murder was committed with extreme atrocity or cruelty, the jury should be allowed to consider the defendant's mental illness and the effect of such an illness on his conduct. *Id.* at 682-683.

We view the evidence as raising a substantial question as to the defendant's ability deliberately to premeditate the

killing. Moreover, the evidence raised the issue whether the defendant possessed the state of mind consonant with the crime of murder by extreme atrocity or cruelty. The judge instructed the jury on the *Gould* mental impairment doctrine.[3] However, defense counsel did not ask the jury to consider the defendant's mental state as it bore on the issue of deliberate premeditation and extreme atrocity or cruelty. Rather, he cryptically argued for a voluntary manslaughter verdict without referring to any evidence of provocation. He referred several times to the defendant as a man out of control, but never asked the jury to consider that characterization as it bore on the defendant's capacity deliberately to premeditate or to commit a homicide with extreme atrocity or cruelty. We are satisfied that, given the evidence tending to show lack of criminal responsibility under *McHoul* and the evidence tending to show a *Gould* defense, the lawyer's concessions at closing argument and surrender of the defendant to a somewhat opaque and poorly conceived manslaughter theory was behavior which falls "measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). We are likewise convinced that this abandonment of viable defenses at final argument, and the dearth of evidence showing provocation "likely deprived the defendant of an otherwise available, substantial ground of defence." *Saferian, supra*. The defendant has established that a better closing argument, discussing the evidence tending to support defenses founded on *McHoul* and *Gould* "might have accomplished something material for the defense." *Commonwealth* v. *Adams*, 374 Mass. 722, 727 (1978).

Thus, we conclude that the defendant was deprived of effective assistance of counsel. Accordingly, we reverse the

[3] The judge charged the jury on murder in the first degree on the bases of deliberate premeditation and extreme cruelty or atrocity. He also instructed the jury on murder in the second degree, voluntary and involuntary manslaughter.

judgment of the Superior Court and remand the case for a new trial.[4]

2. *Issues Likely to Arise During Retrial.*

Our disposition of the first issue renders it unnecessary to resolve the other issues raised by the defendant. However, as some issues will likely recur during the new trial, we shall treat such issues here.

A. *Statements to police.* The defendant sought to suppress a statement he made to Lieutenant James Sharkey, a State police detective, on the night he was arrested. The trial judge conducted a hearing and denied the motion. At trial, Lieutenant Sharkey read the statement in evidence. The motion to suppress was properly denied.

To determine whether a defendant voluntarily waived his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and its progeny, the court must consider the putative waiver in view of the totality of the circumstances. *Commonwealth* v. *Santo*, 375 Mass. 299, 303 (1978). Every rational presumption against a waiver of fundamental constitutional rights will be indulged. *Commonwealth* v. *Taylor*, 374 Mass. 426, 436 (1978). *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 267 (1982). The Commonwealth bears a heavy burden in proving that the defendant knowingly, voluntarily, and intelligently waived his rights. *Miranda*, 384 U.S. at 475. *Commonwealth* v. *Day*, 387 Mass. 915, 920 (1983). *Commonwealth* v. *Garcia*, 379 Mass. 422, 429 (1980). *Commonwealth* v. *Watkins*, 375 Mass. 472, 485 (1978). However, to sustain its burden, the Commonwealth need not show an explicit statement by the defendant that he is waiving his rights. *Santo, supra.*

In reviewing a judge's decision on a motion to suppress, we accept a judge's resolution of conflicting testimony, and we will not disturb his subsidiary findings if supported by the evidence. *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145 (1982). *Commonwealth* v. *Taylor, supra* at 431.

---

[4] See generally *Commonwealth* v. *Street, supra* 281 (on similar facts we held defendant was deprived of effective assistance of counsel).

His finding of voluntary waiver is entitled to some deference on appeal; however, "[o]ur appellate function requires that we make our independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found . . . .'" *Commonwealth* v. *Tavares, supra* at 145, quoting *Brewer* v. *Williams,* 430 U.S. 387, 403 (1977). *Commonwealth* v. *Aarhus,* 387 Mass. 735, 745 (1982).

Based on the findings of fact explicitly made by the judge and on the evidence presented to him at the hearing, we summarize the facts surrounding the defendant's statement. The defendant was brought to the Chelsea police station at approximately 10 P.M. on the night of the homicide. Detective Robitaille, the officer in charge of prisoners that night, informed the defendant of his Miranda rights, including the right to cut off questioning, and the defendant said he understood these rights. As Robitaille had not yet received notification of the victim's death, he told the defendant that the exact charge was unknown. Robitaille subsequently observed the defendant, who had been placed in a cell, attempting to wash off blood stains on his clothing. Under Robitaille's direction, some uniformed officers had the defendant remove all his clothing except his undershorts and socks. From the time the defendant removed his clothes to the time Lieutenant Sharkey spoke to him, the defendant was not interrogated by anyone.

One hour after the defendant was brought to the station, Lieutenant Sharkey arrived. He approached the defendant, who was in a cell, introduced himself, and told the defendant that he would like to talk to him. Lieutenant Sharkey sat down on a chair outside the cell and informed the defendant of his Miranda rights. The defendant said he understood. After some preliminary questions by the lieutenant, the defendant was informed that the victim had died. The defendant replied that he was saddened by this fact, but that he did not do it. He continued speaking and said, "The mother of my children, she's dead. On the real side of this she is dead in reality. I'll play it by ear and I'll wing it from here. I'm not making any statement knowing

that I am being held for this alleged murder of said person. I know it is not murder and I did not contribute to what is alleged to be murder." The lieutenant then asked the defendant if he had been drinking. The defendant answered that he had consumed no more than three drinks; he continued to answer other questions propounded by the lieutenant.

The defendant appeared calm and composed. He did not appear to be intoxicated or disoriented. There was no evidence of coercion, deception, or inducements. The defendant carefully chose his words and regulated the tempo of his speech so as to accommodate the lieutenant's attempt to write down his words. The questioning lasted approximately ninety minutes. The defendant asked the lieutenant, "Do you want me to sign the statement?" The statement could be viewed as being detrimental to the defendant's assertion of insanity and mental impairment.

Our review of the defendant's statement, viewed in light of all the circumstances, *Commonwealth* v. *Santo,* 375 Mass. 299, 303 (1978), satisfies us that the defendant's remark ("I'm not making any statement knowing that I am being held for this alleged murder of said person") was not intended as an assertion of his right to remain silent. This case is not unlike *Commonwealth* v. *Bradshaw,* 385 Mass. 244 (1982). In *Bradshaw,* we held that the defendant's right to cut off questioning was scrupulously honored. *Id.* at 264-266. There, the defendant was answering questions and, at one point, his voice dropped and he said, "I don't want to talk." The interrogating officer then said, "And then what?" The defendant proceeded to answer additional questions. We said that (1) the officers did not hear the defendant's alleged assertion of his right to cut off questioning, and (2) even if they did hear the statement, the defendant's subsequent conduct indicates that the remark was not intended as an assertion of this right. *Bradshaw, supra* at 265. We noted that without any more encouragement other than the question, "And then what?" the defendant continued speaking. *Id.* at 265-266. We also noted that the

remainder of the interview indicated that the defendant desired to talk, even as the officer was attempting to conclude the interview. *Id.* at 266. We concluded that the image was that of a man who wanted to talk, not of one who was being forced to talk. *Id.*

In this case the defendant's conduct subsequent to his alleged assertion of his right belies his contention that he, in fact, exercised his right to cut off questioning. Without any encouragement, he proclaimed his innocence immediately after his alleged assertion of his right. Further, he responded affirmatively to the question whether he had been drinking and expressed disbelief that the victim had died. He voluntarily answered most of the subsequent questions, but decided to "pass" on two questions. As we said in *Commonwealth* v. *Mandeville,* 386 Mass. 393, 404 (1982), "When an individual [decides to pass] as to certain questions and voluntarily answers other questions, the conclusion is almost inescapable that the answers are made with full knowledge of the right to remain silent." Additionally, the defendant asked the lieutenant whether he should sign the statement. The lieutenant's response to the defendant's alleged assertion of his right "reflects neither a subtle attempt to turn him 'toward an inculpatory statement,' *Commonwealth* v. *Brant,* [380 Mass. 876, 886, cert. denied, 449 U.S. 1004 (1980)], nor a 'deliberate decision . . . to interrogate [the defendant] in spite of his desire to remain silent,' *Commonwealth* v. *Jackson* [377 Mass. 319, 326 (1979)]." *Commonwealth* v. *Bradshaw,* 385 Mass. at 266. Moreover, "[n]othing in the record indicates a persistent effort by police to wear down the resistance of a person in custody who has cut off questioning" (footnote omitted). *Commonwealth* v. *Atkins,* 386 Mass. 593, 598 (1982). See *Michigan* v. *Mosley,* 423 U.S. 96, 105-106 (1975). We conclude that the defendant's right to silence was "scrupulously honored." *Id.* at 104. Additionally, we conclude that the judge was correct in finding that the defendant had waived his right to remain silent. The Commonwealth met its heavy burden. The statement is admissible.

B. *Admission of photographs and a bloody knife.* The defendant argues that the judge erred in admitting four autopsy photographs of the victim's body and one blood-stained knife. The photographs graphically demonstrated the numerous knife wounds and bruises to the victim's torso, arms, hands, and head. The knife was stained with blood. There was evidence from which the jury could infer that the blood on the knife was the victim's blood.

The admissibility of photographs is a matter almost entirely left to the sound discretion of the trial judge. *Commonwealth v. Bradshaw,* 385 Mass. 244, 270 (1982). *Commonwealth v. Bastarache,* 382 Mass. 86, 106 (1980). *Commonwealth v. Bjorkman,* 364 Mass. 297, 302 (1973). "It is a 'rare instance[ ] in which the probative value of [such] evidence is [so] overwhelmed by its inflammatory potential' that a reversal would be warranted." *Bradshaw, supra,* quoting *Commonwealth v. Repoza,* 382 Mass. 119, 128 (1980). In this case the defendant argues that the photographs were so gruesome that their prejudicial effect outweighed their probative value. We disagree. The case was submitted to the jury on a theory of murder in the first degree based, inter alia, on extreme cruelty or atrocity. The photographs were relevant on that issue. *Commonwealth v. Campbell,* 378 Mass. 680, 705 (1979). *Commonwealth v. Laliberty,* 373 Mass. 238, 239 (1977). *Commonwealth v. Sheppard,* 313 Mass. 590, 599, cert. denied, 320 U.S. 213 (1943). See *Commonwealth v. Jones,* 319 Mass. 228, 229 (1946). Photographs, otherwise admissible, are not rendered inadmissible because they are gruesome. See P.J. Liacos, Massachusetts Evidence 403 (5th ed. 1981). There was no error in admitting the photographs.

Likewise, the bloodstained knife was not improperly admitted. Articles found at the scene of the crime, which are relevant, are admissible. *Commonwealth v. Giacomazza,* 311 Mass. 456, 470 (1942). Any prejudicial potential was outweighed by the probative value on the issue of the identification of a murder weapon.

C. *Expert testimony.* The defendant argues that the judge erred in allowing the Commonwealth's psychiatric witness to testify that the defendant was "criminally responsible." In *Commonwealth* v. *Vazquez,* 387 Mass. 96, 104 (1982), we held that an expert witness may testify only in accordance with the standard set forth in *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967). We held that the judge erred in allowing the witness to testify that the defendant was criminally responsible. *Id.* A significant difference, however, between *Vazquez* and the case before us is that, in *Vasquez,* the prosecutor asked the witness whether he had an opinion as to the defendant's criminal responsibility. In the case before us the prosecutor asked the proper question under *McHoul,*[5] and the witness gave a responsive answer. There is no error. There was no infringement on the jury's duty to determine the issue of criminal responsibility. In any event, defense counsel did not move to strike the answer, and its admission does not constitute a miscarriage of justice. See *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967).

D. *Instructions.* Finally, the defendant claims error in the jury instructions on various issues. Because we reverse the conviction and remand for a new trial, we need not discuss these issues. *Commonwealth* v. *Callahan,* 386 Mass. 784, 793 (1982).

*Conclusion.* We hold that the defendant was denied effective assistance of counsel. We reverse the judgment of the Superior Court, set aside the verdict, and remand the case for a new trial.

*So ordered.*

---

[5] The prosecutor asked, "[D]id you form an opinion, with reasonable medical certainty, as to whether or not Leonard Westmoreland, on the night of March 4th, 1980, was able to appreciate the criminality or the wrongfulness of his actions or to conform his conduct with the requirements of the law?"