COMMONWEALTH vs. ALBERT P. MEROLA.

Plymouth. April 3, 1989. — August 8, 1989.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

Homicide. Constitutional Law, Fair trial, Assistance of counsel. Social Worker. Evidence, Privileged communication, Cross-examination, Hearsay, Photograph, Relevancy and materiality, Expert opinion, Consciousness of guilt, Admissions and confessions. Practice, Criminal, Instructions to jury, Appeal.

Evidence at a murder trial warranted the jury's finding the defendant guilty of murder in the first degree on the ground of extreme atrocity and cruelty in the death of an eighteen month old child. [533-535]

At the trial of a defendant charged with the murder of an eighteen month old child, the exclusion of certain evidence contained in confidential records of the Department of Social Services, which concerned the investigation of the child's death and, generally, the child's family, presented no occasion for disturbing the defendant's conviction, where the trial record showed that the defense made a tactical decision not to pursue the line of evidence to which the records allegedly were germane, that is, the mother's relationship and disposition toward the child, and where, in any event, the evidence would properly have been excluded on the ground the records were not relevant. [535-542]

The record of a murder trial did not support the defendant's contention that the judge impermissibly restricted his cross-examination of the victim's mother as to her state of mind at the time of her grand jury testimony. [542-543]

At a murder trial the judge did not err in denying defense counsel's request that he be allowed to confer privately with a witness who was in the midst of testifying. [543]

At a murder trial the judge properly excluded questions on cross-examination that called for inadmissible hearsay. [543-544]

At the trial of a defendant charged with the murder of an eighteen month old child, the judge properly admitted testimonial and, with appropriate jury instructions, photographic evidence of bruises on the child's body, where this evidence bore on the timing of the victim's injuries and the manner of their infliction, and was probative of the defendant's consciousness of guilt, inasmuch as the defendant had denied seeing the bruises on the victim's body. [544-545]

At a murder trial the judge properly allowed the prosecution's hypothetical questions to its experts. [545-546]

At a murder trial, evidence of the defendant's false statements to police and his denial of having seen bruises on the victim's body warranted an instruction to the jury on consciousness of guilt. [546-547]

At a murder trial, the decision of defense counsel, as part of his trial strategy, not to object to the admission of evidence of certain statements by the defendant did not establish that counsel's assistance had been ineffective. [547-548]

Where evidence at a murder trial supported the jury's verdict of guilty of first degree murder of an eighteen month old child on the theory of extreme atrocity or cruelty, no reason appeared for this court to exercise its power to order a new trial or to direct the entry of a verdict of murder in the second degree. [548-549]

INDICTMENT found and returned in the Superior Court Department on October 17, 1984.

The case was tried before *J. Harold Flannery*, J.

*Eileen D. Agnes* for the defendant.

*Ann E. Rascati*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree on the ground of extreme atrocity or cruelty in the death of an eighteen month old boy named Donald,[1] the defendant, Albert P. Merola, appeals. The defendant argues that the judge erred in (1) denying the motion for a required finding of not guilty; (2) denying the motion to allow use of confidential Department of Social Services (DSS) records; (3) his evidentiary rulings; and (4) the instructions to the jury. The defendant also asserts that his trial counsel was ineffective. The defendant asks that, in the event we reject his claims of error, we exercise our power under G. L. c. 278, § 33E (1988 ed.), and order a new trial or, alternatively, that we reduce the verdict to a lesser degree of guilt. We affirm. We decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

We summarize the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Cordle*, 404 Mass. 733,

---

[1] Because there may be some references to confidential information in the course of the opinion, we have used fictitious names for the mother and child.

734 (1989). The victim, Donald, was alive and well on August 26, 1984. He spent part of the day in the back yard of his home in Hull, with his mother, Abigail; his older sister (age nine); one of his older brothers (age five); the defendant; some neighbor children; and a friend of Abigail named Stacey. The defendant was Abigail's boy friend at that time; at the time of trial, they were engaged to be married. Donald played in a wading pool with the defendant for well over one hour. The child showed no signs of dizziness, incoordination, or paralysis. He did not vomit and did not appear to be suffering pain. The child appeared much as usual.

At approximately 3 P.M., Abigail and her family, Stacey, and the defendant went into Abigail's apartment. Stacey served the older children lunch while Abigail went to take a shower and the defendant took Donald and put him to bed for a nap. Donald usually slept on a mattress and box spring placed on the carpeted floor of his room. In the meantime, James, a neighbor, came in to use the telephone in the living room. The defendant did not reappear in the living room or kitchen where Stacey was until about 3:40 P.M., when he came down the hallway bearing Donald's limp body. He was followed by Abigail, who was naked, dripping wet, holding a towel in front of her, and screaming. The defendant said that an ambulance was needed and that Donald was not breathing.

A fire fighter, Gary Fleck, arrived within minutes and found Abigail on the porch of her house holding Donald. Finding no vital signs, Fleck began mouth-to-mouth resuscitation on the child. Donald was dressed only in a diaper. There were no wounds, cuts, or blood on his body. Fleck and another fire fighter continued to perform mouth-to-mouth resuscitation and cardiopulmonary resuscitation (CPR) on the way to the hospital, and succeeded in restoring the child's breathing for two short intervals. The child was breathing when he arrived at South Shore Hospital. The defendant and Abigail arrived shortly thereafter. Abigail was "hysterical"; the defendant was calm, "laid back and chain smoking," and supportive of Abigail.

Nurse Dorothy Blanchard observed Donald in the emergency room and later in the intensive care unit. She saw bruises on

the child's left forehead and left chin, in the rectal area, and on the left side of his abdomen. The emergency room record also notes bruises on the base of the spine, on the scalp over the left eyebrow, and on the left cheek and chin. There were red round marks on the upper buttocks and on the base of the spine. The record also noted a rash in the rectal area and a grapefruit-sized bruise on the left lower abdomen. A police officer observed bruises on the child's left leg.

The child continued to breathe with mechanical assistance following admission to the hospital, and remained semi-comatose. Diagnostic tests revealed massive swelling of the brain, particularly on the left side. The physicians who examined Donald expressed the opinion that he had suffered a closed head injury (i.e., one in which the brain was injured although the skull was intact) caused by either blunt force or shaking, or both. Either type of injury would have required the application of force equivalent to a fall from a third-story window or a severe motor vehicle accident. Such an injury would be likely to render a patient unconscious within moments. Donald lived in a comatose condition for three days and died on August 29. Postmortem examination showed that he died of massive brain swelling and subdural hematoma (collection of blood between the brain and the skull) consistent with blunt force or shaking.

The police officer examined the family apartment and questioned the defendant shortly after midnight, i.e., in the early hours of the day following Donald's admission to the hospital. The officer noted that the mattress and box spring in Donald's room together were thirteen to fourteen inches high and that the carpeting was soft. There was no blood nor any other evidence of violence. The defendant told the officer that he had noticed the bruise on Donald's leg but he denied having seen any other bruises. The defendant told the officer that he had been watching television in the living room after putting Donald to bed that afternoon. He started down the hall toward the bathroom where he intended to join Abigail. As he passed Donald's room, he heard a thud. He opened Donald's door and saw Donald on the floor. The child was not breathing. The defendant picked him up, attempted to administer CPR,

and brought the child into the bathroom where the child's mother was taking a shower.

1. *The motion for a required finding of not guilty.* The defendant argues that the evidence, viewed in the light most favorable to the Commonwealth and taken together with permissible inferences, is insufficient to establish the defendant's guilt beyond a reasonable doubt. He argues, therefore, that the judge erred in denying his motion for a required finding of not guilty. We do not agree.

"[T]he question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). See Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). The issue is whether the evidence, including reasonable inferences from that evidence, is "sufficient to permit a rational jury to find beyond a reasonable doubt that the defendant had committed murder in the first degree." *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). "[I]t is not necessary to prove that no one other than the accused could have performed the act." *Commonwealth* v. *Casale*, 381 Mass. 167, 175 (1980). However, "[t]he question of guilt must not be left to conjecture or surmise." *Commonwealth* v. *Anderson*, 396 Mass. 306, 312 (1985). Mere opportunity to commit the crime or presence at the scene of the crime without other evidence is insufficient. See *Commonwealth* v. *Cordle*, 404 Mass. 733, 734 (1989). Circumstantial evidence is competent to establish guilt beyond a reasonable doubt. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986), and cases cited. An inference drawn from circumstantial evidence "need only be reasonable and possible; it need not be necessary or inescapable." *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). "The Government . . . need not exclude every reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt." See *United States* v. *Systems Architects, Inc.*, 757 F.2d 373, 377

(1st Cir.), cert. denied, 474 U.S. 847 (1985). We conclude the evidence is sufficient and that there was no error in the denial of the defendant's motion.

The main evidence against the defendant was the medical evidence. From the medical evidence the jury could have concluded that after sustaining the injury to his brain, Donald "would be in great distress" and would lose consciousness. Such symptoms would occur within "[m]oments, probably, if not seconds," after the head injury was sustained.

The defendant took Donald, alive and well, to Donald's bedroom around 3 P.M. The defendant did not reappear until 3:40 P.M. when he carried the unconscious child first to the bathroom and then to the living room. The defendant told the police[2] that he told Donald to go to bed, then left him and went to watch television in the living room, and that he left the living room only moments before he started down the hall and found Donald unconscious. Stacey and James were in the living room at that time and both stated that the defendant was not there. Stacey stated that the defendant told her he was in the shower with Abigail during that time. Abigail stated the defendant was not in the shower with her at that time.

Medical testimony indicated that severe forces had been exerted on the child.[3] Donald also had other, older bruises on his body. When interrogated by police, the defendant denied seeing any bruises on the child's body. A jury could infer that the defendant made false statements to the police, that he lied about his observations of other bruises on Donald's body, and that these lies were evidence of the defendant's consciousness of guilt.

---

[2] The defendant argues that these statements to the police should not have been admitted, and that trial counsel's failure to object to their admission constituted ineffective assistance of counsel. We disagree. See *infra* at 547-548.

[3] The jury could reject the possibility of accidental injury. The medical evidence showed that the force applied to Donald was equivalent to fall from a third-floor window onto a hard surface, or a severe motor vehicle accident. A fall from his thirteen-inch high bed, or indeed from any other piece of furniture in the room, onto the thickly carpeted floor could not have produced the necessary force. A jury also could conclude from the expert testimony that the eighteen month old victim was incapable of inflicting such force on himself.

Although the Commonwealth need not prove that no one else could have committed the murder, see *Commonwealth* v. *Casale, supra* at 175-176, the whereabouts of the other persons present at the house that day are accounted for: Abigail was in the shower; Stacey was first in the kitchen with the two older children and then in the living room; the neighbor James was in the living room; the children were first in the kitchen, and then outside (the nine year old girl) and in the living room (the five year old boy), respectively. Thus, a jury could conclude the defendant had the exclusive opportunity to inflict the fatal injury. That evidence distinguishes this case from *Commonwealth* v. *Mazza*, 399 Mass. 395 (1987).

The defendant also asserts that *Commonwealth* v. *Salemme*, 395 Mass. 594 (1985), and *Berry* v. *Commonwealth*, 393 Mass. 793 (1985), should govern his case. In both these cases, two people had equal opportunity to inflict the fatal injuries. We held, accordingly, that the defendant's guilt was not adequately established in either case. As we have noted, in the present case, the jury could conclude no one had an equal opportunity along with the defendant to inflict the fatal injury. The defendant's reliance on these cases is therefore misplaced. There was no error in denying the motion for a required finding.

2. *Restriction on use of confidential DSS records.* The defendant argues that the exclusion of certain evidence prejudiced the defendant's ability to present a defense in violation of his rights under the Fourteenth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Constitution of Massachusetts. See *Chambers* v. *Mississippi*, 410 U.S. 284, 294-295 (1973) (right to cross-examine); *Washington* v. *Texas*, 388 U.S. 14, 18-19 (1967) (right to compulsory process); *In re Oliver*, 333 U.S. 257, 273 (1948) (right to present material evidence in defense). Cf. *Commonwealth* v. *Joyce*, 382 Mass. 222, 229-230 (1981) (right to cross-examine complainant to show bias in rape case), and *Commonwealth* v. *Haywood*, 377 Mass. 755, 760-761 (1979). The evidence in question concerned the possible inclination of Abigail to injure the child, and is contained in records of

DSS.[4] Under G. L. c. 112, § 135 (1988 ed.),[5] these records are confidential, unless an exception applies. The defendant argues, in effect, that the exception for confidences that reveal the contemplation or commission of a crime must be read broadly when the material is necessary for the defendant's case, or, if the exception does not apply, then the statute "must yield to constitutional considerations." *Commonwealth* v. *Ferrara*, 368 Mass. 182, 186 (1975). The documents are before us on appeal as sealed records. We conclude that we need not decide the precise boundaries of the statutory exception for confidences revealing the contemplation or commission of a crime. The exception clearly does not apply in the instant case, and constitutional considerations are not implicated.

It is helpful to review the prior proceedings on this issue. The defendant moved before trial for production of DSS files concerning DSS's investigation of Donald's death and, generally, the victim's family. The motion judge denied the motion after an in camera inspection, but the prosecutor eventually turned material over to counsel for the defendant, in the belief that a court order required him to do so. The correctness of that action is not before us.[6]

---

[4] The parties all agreed that the DSS was a "social worker" for purposes of the statute. The judge and the parties noted that there might be hearsay barriers against admission of the records or oral testimony from social workers. They assumed in their discussions that they would overcome these barriers and focused solely on the privilege, although the prosecutor expressly declined to waive other objections.

[5] "General Laws c. 112, § 135, prohibits disclosure by a licensed social worker of information acquired from persons consulting him [or her] in his [or her] professional capacity . . . ." *Commonwealth* v. *Collett*, 387 Mass. 424, 426-427 (1982). The statute contains an exception for "a communication that reveals the contemplation or commission of a crime or a harmful act," which need not (and indeed, may not) be kept confidential. G. L. c. 112, § 135 (*b*); *Collett, supra* at 431.

Section 135 was inserted by St. 1977, c. 818, § 2, and has been amended through St. 1987, c. 566, § 12. The amendments do not affect the language relevant to the instant case.

[6] The records were sealed by the trial judge. Appellate counsel for the defendant moved for access to the sealed records. After a hearing on the motion, a single justice of this court ordered that the sealed documents be made available to appellate counsel for purposes of filing a supplemental brief and for use at oral argument before the full court.

At trial, just before Abigail's testimony, the judge engaged in a lengthy discussion (characterized in the transcript as a "voir dire") with the attorneys for the defendant, for the prosecution, and for Abigail, as to the use that defense counsel might make of the DSS material. During the colloquy, the defendant moved that he be allowed to use the DSS records to impeach Abigail's expected testimony. The Commonwealth took the position that the information was privileged and that it also was irrelevant, based on the remoteness of any of the allegedly damaging material from the time of Donald's death. The defendant's position was that the records would help him to impeach Abigail's testimony and, by opening up the subject of her relationship with her children and her alleged inclination to injure Donald, cast reasonable doubt on the defendant's guilt.

The judge in effect denied the defendant's motion on the ground that it would require him to rule in the abstract, before the issue of the use of the records was inescapably presented. The judge told defense counsel that in the event Abigail testified inconsistently with her statements to the DSS, defense counsel should at that point approach the sidebar and raise the issue anew. The judge indicated his present thinking on the issue: that defense counsel could not be asked to purge from his mind the records he had already read; that the statutory privilege did not immunize Abigail from testifying as to matters she may have discussed with social workers, including her relationship with her children; but that the statutory privilege would probably preclude defense counsel from asking Abigail whether she had made certain statements to DSS, or, if she denied it, impeaching her with her prior, confidential statements. The judge stated that he thought *Commonwealth* v. *LeCain*, 19 Mass. App. Ct. 1034 (1985), bound him to such a conclusion.[7]

---

[7] The *LeCain* case presented strikingly similar facts. The defendant was charged with killing his girlfriend's one year old child. He sought to introduce evidence from social work records to impeach the child's mother's "testimony that she was an easy going person who got along with her family and loved her child." *Commonwealth* v. *LeCain, supra* at 1034. The Appeals Court held that the assertedly privileged communications were too remote in time from the child's death to come within the statutory exception in G. L. c. 112, § 135 (*b*), and that the information did not "relate directly

The judge made it clear, however, that he would not actually so rule unless and until the issue arose inescapably in the course of the witness's testimony. The judge also reviewed the records and professed himself "relieved" to find the matters contained therein "peripheral." He stated: "[The records] are . . . not material, by any reasonable definition of materiality . . . . I think the materials are little ado about less."

The judge, as the "directing and controlling mind at the trial," *Whitney* v. *Wellesley & Boston St. Ry.*, 197 Mass. 495, 502 (1908), could properly refuse to rule until such time as it became necessary. If Abigail answered all questions truthfully, or consistently with the material contained in the confidential reports, then there would be no need to resort to the confidential material, and the issue would be avoided.

It is clear from the record that the defendant simply decided not to pursue this line of inquiry. In the examination of Abigail that followed the colloquy, the defendant made no attempt to explore her relationship with Donald or her other children. Instead, defense counsel inquired as to the child's health the week and morning of the fatal injury, and as to the other parties who might have had a history of punishing Donald or a motive or inclination to do so.[8] At one point, defense counsel asked Abigail whether she ever saw the defendant physically punish any of the children. She replied: "No. In fact — when I disciplined them, he'd tell me not to be so hard on them, they're just kids." Defense counsel, however, did not follow up on that response, but went on to a different subject. He made no use of the available nonprivileged evidence relating to the witness's history of behavior. He did not ask for a voir dire of the witness. The entire thrust of the defense case was to cast doubt on the timing of the fatal injury and to undermine the medical evidence supporting the Commonwealth's theory of the time the fatal injury was inflicted. The defendant offered

to the fact or immediate circumstances of a crime." *Id.* at 1035, quoting *Collett*, *supra* at 435.

[8] These parties included the day care providers who ran the day care center that Donald attended, and the boy friend of a neighbor who babysat for Donald two nights before the day of the fatal injury.

evidence suggesting a different timing for the infliction of the fatal injury in an effort to persuade the jury that the injury might have been inflicted days earlier, when many people had the opportunity to do so.[9]

The foregoing facts convince us that the defendant made a tactical decision at trial not to pursue a line of evidence concerning Abigail's disposition to injure Daniel. Having made that decision at trial, he cannot change tactics on appeal. "[W]e shall not disregard the theory of law on which the parties proceeded at trial." *Commonwealth* v. *Thompson*, 382 Mass. 379, 382 (1981). See *Commonwealth* v. *Freiberg, ante* 282, 288 (1989).

Moreover, had the defendant asked questions involving use of confidential material, the judge would have been justified in excluding them on grounds of remoteness. There was therefore no ineffective assistance of counsel in failing to pursue such questions.[10] We wrote in *Commonwealth* v. *Collett*, 387 Mass. 424, 434 (1982), that "[t]he first objective [of G. L. c. 112, § 135,] is to encourage individuals in need of help from a social worker to seek that help by ensuring the confidentiality of their communications. The second objective, embodied in subsection (*b*), is to serve the interests of society in prosecuting those who are guilty of criminal conduct."[11] We also specified the correct procedure for determining whether given material comes within an exception to the statute: "The determination of which information comes within exception (*b*), because it reveals the contemplation or commission of a crime or harmful act, is a legal question for the judge's [in camera] consideration." *Id.* at 438. We recognize that when

---

[9] The prosecution did not portray Abigail in a misleading light, or indeed in any particular light at all. Cf. *Commonwealth* v. *LeCain, supra* (child's mother portrayed herself as easygoing and loving parent). The Commonwealth's case rested heavily on the medical evidence and the timing of the injury, which excluded everyone except the defendant.

[10] The defendant does not allege ineffective assistance on this point. We consider the matter pursuant to our duty under G. L. c. 278, § 33E.

[11] In *Collett*, it was the Commonwealth that sought the privileged information about a defendant, and not, as in the instant case, a defendant who sought the information for his defense.

a defendant seeks information vital to his or her defense, the considerations we raised in *Collett*, and the balancing of objectives might in some circumstances give a different result. The "denial or significant diminution [of the right to confront and cross-examine witnesses] calls into question the ultimate ' "integrity of the fact-finding process" ' and requires that the competing interest be closely examined." *Chambers* v. *Mississippi*, 410 U.S. 284, 295 (1973), quoting *Berger* v. *California*, 393 U.S. 314, 315 (1969). See *Commonwealth* v. *Ferrara*, 368 Mass. 182, 188-190 (1975) (attendant circumstances considered in balancing policy interest in protecting confidentiality of juvenile offender's record against defendant's right to cross-examine). However, nothing in *Collett*, in G. L. c. 112, § 135, or in the decisions of this court or the United States Supreme Court concerning a defendant's right to present evidence in his favor detracts from a judge's authority to assess the relevance of proffered evidence and to exclude evidence that is of marginal relevance. See *United States* v. *Nixon*, 418 U.S. 683, 714-716 (1974) (judge to isolate admissible and relevant evidence and return remainder under seal to its lawful custodian). See also Fed. R. Evid. 401 (1989) and 1 J. Weinstein & M. Berger, Evidence par. 401-44 – par. 401-45 (1985). Given the statutory purpose of promoting therapeutic relationships it is essential that exception (*b*) be read in conjunction with a relevance standard. Cf. *Collett*, *supra* at 435 (exception [*b*] to be narrowly construed).

In the instant case, the motion judge followed the requirements of *Collett* and ruled on the admissibility of the records after an in camera inspection. Thereafter, apparently through a misunderstanding, the records were revealed to the prosecution and the defense. The trial judge assessed the evidence once again. The records, under seal, are now before us and we, too, have examined them. See *Commonwealth* v. *Lewinski*, 367 Mass. 889, 903 (1975).

The DSS records show resort to foster care placements (formal and informal, i.e., with friends) for Abigail's children dating back to May, 1977 (six years before Donald's birth). The twenty episodes included four for suicide attempts of the

mother and twelve for the mother's hospitalizations for physical ailments. The children also were placed in foster care once in 1978 because Abigail's live-in boy friend (not the defendant) was very violent and had a high potential for sexually abusing the children; once in 1982 when (a) the family lost its housing due to uninhabitable conditions, (b) Abigail was pregnant, and (c) Abigail had been arrested for selling drugs; and once again in 1982 when the family's housing arrangements again "fell through." Abigail also requested that her oldest son be placed in care because she was unable to control him. Abigail has a history of substance abuse. Abigail threatened in February and March, 1981 (two years before Donald's birth), to kill a neighbor's child whom she considered a bad influence on her oldest son. In 1981, one of the social workers wrote that Abigail's "pattern was to often precipitate a crisis, decompensate severely, become suicidal and then recompensate rapidly after a brief hospitalization."

The records show that Abigail was in the hospital for over a month following Donald's birth on February 27, 1983. The other children were in foster care. Abigail underwent a radical hysterectomy due to cancer ten days after delivery. Infection kept Abigail in the hospital through April 3. During that time Abigail told the hospital staff she did not intend to discontinue her substance abuse. The hospital staff monitored Abigail and Donald for forty-eight hours before discharging them.

In April, 1983, when Donald was two months old, a physician filed a report, pursuant to G. L. c. 119, § 51A (1988 ed.), alleging that he had witnessed indications of maltreatment of Donald, and that he felt that there was a serious potential for abuse and neglect. The physician gave no details, and an investigation did not substantiate the allegations.

In August, 1983, when Donald was six months old (one year before his death), Abigail called her social worker in an "hysterical" state. She was angry with the social worker; she was suffering from a kidney infection; and she had been told she would have to move in two weeks because her apartment did not pass an inspection. She said she could not "take it anymore" and threatened to kill herself and her four children.

By the time the social worker arrived, Abigail had calmed down. She did not appear suicidal but rather "hysterical" and "manipulative." In March, 1984, when Donald was twelve and one-half months old, he was hospitalized for diarrhea and dehydration.

The final paragraph of the records, before the section dealing with Donald's death, states: "On July 5, 1984, a full case review was held on [Donald's] family. . . . [Abigail] continued to exhibit improvement in her 'ego strengths' and 'interpersonal relationships,' and . . . she was able to anticipate, as well as deal with, crisis situations. . . . [N]one of [Abigail's] four children appeared to be at 'physical risk.' "

We agree with the assessments of the motion judge and the trial judge. The DSS records shed little light on Abigail's relationship with Donald and in no way explain his death. They do not reveal a history or pattern of physical abuse of her children. The two incidents indicating Abigail might harm her children occurred, respectively, sixteen and twelve months before Donald's death. The incident that occurred sixteen months earlier was found after investigation to have no substance and thus could not have been used. The one twelve months earlier did not bear on Abigail's inclination to injure Donald in the circumstances presented on August 26, 1984. Rather it concerned Abigail's threat to kill herself and her children because of the adverse circumstances then facing her. The records therefore would properly have been excluded on grounds of remoteness.

3. *The judge's rulings during trial.* The defendant asserts that the trial judge erred in several rulings during the trial. We discuss each in turn.

a. The defendant argues that the judge impermissibly restricted his cross-examination of Abigail. Cross-examination for the purposes of demonstrating bias is a matter of right. *Commonwealth* v. *Franklin*, 376 Mass. 885, 904 (1978), citing *Berger* v. *California*, 393 U.S. 314, 315 (1969). See *Commonwealth* v. *Joyce*, 383 Mass. 222, 229 (1981); *Commonwealth* v. *Haywood*, 377 Mass. 755, 760 (1979). Specifically, the defendant asserts that he should have been allowed to cross-

examine Abigail about her circumstances and state of mind at the time of her grand jury testimony, which was more favorable to the Commonwealth than her testimony at trial.[12] The record does not support the defendant's contention that his right to cross-examine was restricted.

Defense counsel asked the judge, at side bar, whether he might speak to the witness in private concerning her "duress." The judge stated that he would not permit any witness to confer privately with anyone (except his or her own attorney) while in the midst of testifying. The judge offered to conduct a voir dire, but the defendant declined the offer. The record does not support a claim that defense counsel could not have interviewed the witness prior to trial and, indeed, the defendant made no such claim at trial. Cf. *Commonwealth* v. *Balliro*, 349 Mass. 505, 516 (1965). There was no error in the denial of the request of counsel to interview a witness in the midst of the witness's testimony.

b. The defendant argues that the judge improperly restricted his cross-examination of Abigail on the subject of Donald's treatment at a day care center. Abigail stated that Donald fell off a porch there one week before August 26 and that, several days later, Donald was gray and sluggish. A friend of Abigail, Pamela, stated that Donald was gray when she and Abigail picked him up from the day care center and that he had a bruise on his forehead. Donald's nine-year-old sister stated that she saw the day care provider strike Donald on several occasions with a ruler or with her hand. The judge excluded questions directed to Abigail concerning the providers' arrest and prosecution for assault and battery of children at the day care center. The judge concluded that Abigail's knowledge of those matters was largely hearsay.

We agree with the judge.[13] The defendant had ample opportunity to present the available competent evidence. The judge

---

[12] The prosecutor used Abigail's grand jury testimony to impeach her trial testimony, and she unexpectedly stated that she was under "duress" during her grand jury testimony.

[13] The defendant argues that excluding this evidence "violated the defendant's right 'to show that other crimes of a similar nature have been committed

did not limit the defendant's ability to present the same evidence through nonhearsay sources. The judge correctly excluded the incompetent hearsay evidence.

c. The defendant contends that the judge erroneously admitted evidence, including photographs, of bruises on the child's body that were never linked to the defendant or to the child's death. There was no error.

"It is axiomatic that the admissibility of photographic evidence is committed to the sound discretion of the trial judge, limited only in those rare instances in which the probative value of the evidence is overwhelmed by its inflammatory potential." *Commonwealth* v. *Repoza*, 382 Mass. 119, 128 (1980), *S.C.*, 400 Mass. 516 (1987). "[W]here the allegedly inflammatory element of a photograph offered as evidence is a natural and inevitable incident of the crime, and the photograph is otherwise probative, there is little basis to disturb the ruling of a trial judge as to its admissibility." *Id.* at 129.

The evidence, both oral and photographic, was probative of two elements of the Commonwealth's case. First, the medical examiner stated that the head bruises and one of the large abdominal bruises were inflicted by blunt force and were consistent in age with the fatal brain injury and with a serious internal abdominal injury. The medical examiner stated that all these injuries were from two to five days old on August 29, 1984 (three days following Donald's admission to the hospital). The evidence was properly submitted to the jury as possibly bearing on the timing of the injuries and the manner of their infliction. Second, the evidence was probative of the defendant's consciousness of guilt, inasmuch as he denied

by some other person when the acts of such persons are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the crime'" (quoting *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 [1979]). The defendant's offer of proof does not substantiate his claim. Apparently the defendant merely wanted to prove that the day care providers had been arrested for assault and battery on a child, a fact which itself has little probative value. Cf. *Commonwealth* v. *Rojas*, 403 Mass. 483, 486 (1988). In any event, Abigail's knowledge would have been hearsay and therefore correctly excluded.

seeing any bruises on Donald's body on August 26, 1984. That denial also was inconsistent with his claim that the bruises were inflicted much earlier than the Commonwealth claimed. The photographs helped the jury understand the medical testimony and also to assess the defendant's credibility.

Further, the judge repeatedly told the jury that the case was not a "child abuse" case, and instructed the jury: "[I]f bruises in the photographs have not been related beyond a reasonable doubt to the death and the defendant or to the defendant as tending to show malice or extreme atrocity or cruelty, then they should play no part in your determination of guilt or innocence." Thus, the judge adequately dispelled any tendency of the photographs or oral evidence to enflame the jury. *Commonwealth* v. *Cadwell*, 374 Mass. 308, 314 (1978). See *Commonwealth* v. *Fratus*, 385 Mass. 551, 553 (1982).

d. The defendant argues that the trial judge should not have permitted the prosecutor to ask the Commonwealth's three medical experts whether a fall from a twelve- to fourteen-inch high bed onto a carpeted floor could have produced Donald's fatal injury. The defendant also argues that a hypothetical question which the Commonwealth posed to the three medical experts was not based on facts in evidence. We disagree.

"The admission of expert testimony is largely within the discretion of the trial judge and will be reversed only where it constitutes an abuse of discretion or error of law." *Commonwealth* v. *Pikul*, 400 Mass. 550, 553 (1987). "The scope and fullness of hypothetical questions must be left to [the] discretion of the trial judge." *Cohen* v. *Maritime Transp. Co.*, 353 Mass. 760, 761 (1968), quoting *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 280, cert. denied, 371 U.S. 852 (1962). There was no error or abuse of discretion.

As to the first hypothetical question, the testimony ruling out accident as a possible cause of death elaborated on the physicians' opinions concerning the force necessary to produce the injuries. The prosecution was entitled to rule out an exculpatory theory regardless of whether the defense ever asserted such a theory. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 359 (1985). *Commonwealth* v. *Burke*, 339 Mass. 521, 530-531 (1959).

As to the second question, there was sufficient basis in the evidence to support it. The defendant did not object at trial (nor even on appeal) to anything particular in the way the question was formulated. Further, the defendant thoroughly cross-examined the experts as to whether changes in the underlying premises, in accordance with a view of the evidence more favorable to the defendant, would affect their opinions concerning the timing of the fatal injury. See *Commonwealth v. Noxon,* 319 Mass. 495, 538 (1946); *Commonwealth v. Simmons,* 8 Mass. App. Ct. 713, 718-719 (1979). The judge also instructed the jury to disregard the opinions if the premises were not established in the evidence. Both questions were properly permitted.

4. *Consciousness of guilt.* The defendant argues that the judge erred in instructing the jury on consciousness of guilt based on the defendant's allegedly false statements to the police and his denial of having seen bruises on Donald's body. The defendant does not allege error in the form of the instruction, but argues that it should not have been given at all.[14] The defendant argues that the allusion to his possible false statements unduly emphasized that aspect of the evidence and created the risk that the jury would find him guilty merely because he may have lied. He also argues that the allusion to the defendant's failure to notice bruises was inappropriate in that he did in fact notice some bruises, and several other witnesses also failed to notice the full extent of bruises.

The evidence warranted the instruction. In *Commonwealth v. Toney,* 385 Mass. 575, 584 n.4 (1982), we noted that false

---

[14] The defendant discussed his objection to a consciousness of guilt instruction with the judge before any instructions were given. Defense counsel argued that the defendant's statements were merely a "negative response to a potentially inculpatory question." The judge stated at that point that he would "not go beyond a conceptual definition or identification of that consciousness of guilt principle." In his instructions, however, the judge alluded specifically to the possibility of the defendant's having made false statements and having failed to notice the victim's bruises. The defendant made no further objection to the instruction. We assume for the sake of argument that he properly saved the issue for appeal. But see *Commonwealth v. Stewart,* 398 Mass. 535, 547-548 n.10 (1986).

statements might be a basis of a consciousness of guilt instruction. See *Commonwealth* v. *Bonomi*, 335 Mass. 327, 348 (1957). The jury heard the defendant's and other witnesses' statements, and saw the photographs. It was for the jury to find the facts as to what happened and what was visible. The purported discrepancies between the true facts, as the jury found them, and the statements made by the defendant and others, were further evidence that the jury could properly consider. *Toney, supra* at 584. The judge fully complied with our holding in *Toney*, and carefully instructed the jury that evidence of consciousness of guilt alone is never sufficient to convict a defendant. There was no error.

5. *Ineffective assistance of counsel.* The defendant argues that his trial counsel was ineffective in failing to object to the admission of the defendant's statements to several witnesses, including three tape recorded interviews with the police. The jury had audiotapes and transcripts of the latter interviews. The defendant argues (citing, inter alia, *Commonwealth* v. *Pleasant*, 366 Mass. 100, 102 [1974]), that because he denied all involvement in Donald's death, his statements were not "admissions" and were therefore excludible as hearsay.[15] The defendant argues that his trial counsel was ineffective in failing to object to the admission of the tapes and failing to move the judge to redact the tapes and transcripts to exclude objectionable material.

Our cases on ineffective assistance of counsel have looked for "behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer . . . [that]

---

[15] "An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish his guilt." *Commonwealth* v. *Bonomi, supra* at 347, citing *Commonwealth* v. *Haywood*, 247 Mass. 16, 18 (1923). "If [the defendant] . . . definitely denied . . . statements and accusations, they would . . . [be] 'nothing but incompetent hearsay,' clearly inadmissible against him since there was no acquiescence in them on his part." *Commonwealth* v. *Sazama*, 339 Mass. 154, 156 (1959), quoting *Commonwealth* v. *Twombly*, 319 Mass. 464, 465 (1946). Accord *Commonwealth* v. *Pleasant, supra.* But see *Commonwealth* v. *Bonomi, supra* at 346-348.

has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), and cases cited. The defendant argues that had his statements been excluded, "the jury would have had a far less clear picture of the events." The interviews, in which the defendant steadfastly denied his guilt, were a way for the defendant to put his version of the story before the jury without testifying and subjecting himself to cross-examination. The fact that such a result might have been achieved by other witnesses does not convert "trial tactics" into a valid ineffective assistance of counsel claim. The defendant's strategy was to show that others had opportunity to cause Donald's death because the injuries could have been inflicted earlier than the time claimed by the Commonwealth. He cross-examined the medical experts vigorously to that effect and argued that the experts of the Commonwealth were wrong in the time of the fatal injuries and therefore many others had the opportunity to inflict the fatal injuries. The record does not support the defendant's claim that trial counsel's decisions were "illogical, incomprehensible or, in the circumstances, incorrect." *Commonwealth* v. *Bertrand*, 385 Mass. 356, 368 (1982). The defense counsel's strategy to attack the evidence as to the time the fatal injury was inflicted was a reasonable defense which defense counsel pursued throughout the trial. Cf. *Commonwealth* v. *Street*, 388 Mass. 281, 285-288 (1983); *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 271-274 (1983).

6. *Review pursuant to G. L. c. 278, § 33E.* The defendant asks that we order a new trial or enter a verdict of murder in the second degree pursuant to our power under G. L. c. 278, § 33E. The determination whether extreme atrocity or cruelty exists is for the jury. It is the jury, as the conscience of the community, which must determine "whether the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty." *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970). The jurors were correctly instructed on the law, and the evidence was sufficient to support the verdict. Reviewing the record "in a large or nontechnical sense," see *Commonwealth* v. *Davis*, 403 Mass. 575, 585

(1988), we conclude there is no reason to exercise our power in the defendant's favor and enter a verdict of a lesser degree of guilt or order a new trial in the interests of justice.

*Judgment affirmed.*