COMMONWEALTH *vs.* RICHARD FERRARA
(and a companion case[1]).

Suffolk.  March 5, 1975. — June 20, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Homicide.  Witness,* Cross-examination, Impeachment.  *Evidence,*
Juvenile delinquency, Impeachment of witness, Contradiction of
witness.  *Constitutional Law,* Confrontation of witnesses.

There was no merit in a contention that G. L. c. 119, § 60, did not
preclude use of a delinquency record of a juvenile in a criminal
proceeding where he was only a witness, not a party.  [183-186]
In a murder case, a defendant who, in accord with G. L. c. 119,
§ 60, was denied use of a juvenile delinquency record of the only
eyewitness to the crime was thereby denied his right of confronta-
tion under the Sixth Amendment to the Federal Constitution where
the defendant would have unqualifiedly had the right to use the
record, had it been that of an adult, to show bias on the part of
the witness.  [186-190]
Evidence in a murder case from which it could be inferred that the
defendants shot a rifle at the victim to harass, rather than to
injure or kill him, justified an inference of recklessness on the de-
fendants' part and warranted verdicts of involuntary manslaughter.
[190-191]
Evidence that a defendant in a murder case was with a codefendant
shooting out street lights, and that thereafter they threw bottles at
the victim and a short time later stood close together on a roof
while the codefendant shot and killed the victim warranted a find-
ing that the defendant and codefendant participated in a joint
enterprise resulting in the victim's death.  [191-192]
Discussion of the Commonwealth's impeaching its own witness with
prior inconsistent statements under G. L. c. 233, § 23, in a murder
case.  [192-193]
Where, at a trial for murder by shooting, a witness for the Common-
wealth denied during questioning by the prosecutor that she had

---

[1] Commonwealth *vs.* Francis Benjamin, Jr.

told either of two persons that she knew who had committed the crime, it was prejudicial error subsequently to allow the prosecutor to elicit from one of such two persons, also a witness for the Commonwealth, that the earlier witness had told the later witness that the defendants shot the victim, even though the later witness's testimony was limited to impeachment. [193-194]

Two INDICTMENTS found and returned in the Superior Court on June 21, 1973.

The cases were tried before *Robert Sullivan*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Christopher D. Dye* for the defendant Ferrara.

*Alfred P. Farese* for the defendant Benjamin.

*Philip T. Beauchesne*, Assistant District Attorney, (*Sandra L. Hamlin*, Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, J. These are appeals under G. L. c. 278, §§ 33A-33H. The defendants had been indicted and tried for the murder of George Pratt, and a jury returned verdicts of guilty of manslaughter against both defendants.

The defendants argue multiple assignments of error. We have concluded that they must have a new trial by reason of constitutional error in the denials of their motions to be allowed to use, in cross-examination, records of the juvenile offenses of a witness introduced by the Commonwealth.

We have considered only such other assignments of error as are likely to have a bearing on the new trials. Additionally, we have held, as will be seen, that manslaughter was properly submitted to the jury as a possible verdict, thereby determining that the defendants are now entitled at best to a new trial rather than to judgments of not guilty.

1. The defendants assign as error the denial during trial of their motions for the production of the records of juvenile offenses of the witness DeWolfe, fourteen years

old, whom the prosecution offered as a witness. The defendants argue that they were entitled to use the records in cross-examination of DeWolfe to show that he had been adjudicated a delinquent for committing acts which would have been crimes if he had committed them as an adult. The judge ruled in substance that, under the statute G. L. c. 119, § 60, the records were not to be made available or referred to during trial. The defendants excepted.

DeWolfe proved to be the only witness who claimed in his testimony to have witnessed the shooting of the victim Pratt. DeWolfe testified that around 12 P.M. or 12:30 A.M., on June 4, 1973, he saw Pratt get out of a taxicab, go into 163 Orton-Marotta Way, South Boston, and then momentarily return to the taxicab; that during this time the defendants, Ferrara and Benjamin, were across the street. DeWolfe heard Ferrara say, "Here comes a nigger," and saw each of the defendants throw a bottle at Pratt. Subsequently, DeWolfe talked with Pratt behind 163 Orton-Marotta Way, then left Pratt there. A few minutes later, after meeting with two friends, Michele Talkowski and Michael Flaherty, DeWolfe walked toward 163 Orton-Marotta Way, where he saw Pratt leaning against the building, ten feet away. DeWolfe testified that he heard two shots ring out, looked up to the roof of 138 Orton-Marotta Way, across the street, and saw Richard Ferrara, wearing a gold jacket, and Francis Benjamin, wearing a sweater.

Ferrara was holding a rifle and was pointing it at Pratt. Benjamin was standing alongside Ferrara. "As a third shot rang out, Pratt fell and I [DeWolfe] thought he was faking for a second." A fourth shot rang out, and DeWolfe went to the body of the victim with Flaherty. DeWolfe then ran from the scene.

DeWolfe also testified that earlier that same evening he had seen the defendants at a ball park shooting out lights with a rifle. On that occasion, Benjamin was shooting the rifle.

We have before us a copy of the juvenile record of DeWolfe, together with a copy of the trial judge's findings as to that juvenile record. We summarize the facts as to the juvenile record. The record discloses multiple charges between 1972 and the date of the trial of the instant cases. Some of these are for such offenses as being a runaway and disorderly conduct; in addition there are two adjudications of delinquency, obviously separate and unrelated to each other. However, the fact that there were only two such adjudications on the record does not necessarily mean that the other matters might not be relevant on the issue of bias. Furthermore, as to one adjudication, relating to a breaking and entering charge, an order for confinement to the Youth Service Board had been suspended and remained in that status as of the night that Pratt was killed. DeWolfe was taken into custody three days after the shooting of Pratt, and remained in custody until the time of trial. The trial judge found that the custody changed to a protective custody at some time.

The defendants argue that the statute, G. L. c. 119, § 60, does not preclude the use of the juvenile record in these cases because the juvenile appeared as a witness only, and not a party. We do not agree.

General Laws c. 119, § 60, as amended through St. 1973, c. 1073, § 16, provides in pertinent part: "An adjudication of any child as a delinquent child under sections fifty-two to fifty-nine, inclusive, or the disposition thereunder of any child so adjudicated, or any evidence given in any case arising under said sections, shall not be lawful or proper evidence against such child for any purpose in any proceeding in any court, and records in cases arising against any child under said sections shall not be received in evidence or used in any way in any such proceeding." From the plain language it is clear that the Legislature intended to provide broadly for the confidentiality of juvenile records. This purpose will not be served by the disclosure of such records, whatever the

status, party or witness, of the juvenile.[2]    The judge
properly construed the statute as requiring the protection
of DeWolfe's records from disclosure or use.

We consider next the question whether the statute,
G. L. c. 119, § 60, and its underlying legislative pur-
poses, must yield to constitutional considerations.

The defendants contend that they were denied their
rights under the Sixth Amendment because, as a conse-
quence of the juvenile records not being afforded to
them, they were deprived of their privilege of cross-
examination as to bias and prejudice of the witness.    We
agree.

The defendants principally rely on the case of *Davis* v.
*Alaska*, 415 U. S. 308 (1974).    In that case the Supreme
Court held that the defendant's opportunity to cross-
examine one Green, a crucial witness for the prosecution,
was unconstitutionally denied.    " 'Our cases construing
the [confrontation] clause hold that a primary interest
secured by it is the right of cross-examination.'    *Douglas*
v. *Alabama*, 380 U. S. 415, 418 (1965)," quoted in 415
U. S. at 315 (1974).    It was shown that the juvenile
records of the witness Green were offered, and should
have been received, not merely to impeach the credibility
of the witness, but also on the issue of bias.

We are aware of no constitutional principle which
confers on a defendant in every case a right to impeach
the credibility of a witness by proof of past convictions or

---

[2] A majority of other jurisdictions with similar statutes have found
the broad language of their statutes to cover the juvenile witness not
a party to the case at bar.    *Thomas* v. *United States,* 121 F. 2d 905
(D. C. Cir. 1941).    *Cotton* v. *United States,* 355 F. 2d 480 (10th Cir.
1966).    *Hammac* v. *State,* 44 Ala. App. 459 (1968).    *State* v. *Guer-
rero,* 58 Ariz. 421 (1942).    *People* v. *Gomez,* 152 Cal. App. 2d 139
(1957).    *State* v. *Kelly,* 169 La. 753 (1930).    *State* v. *Richardson,*
364 S. W. 2d 552 (Mo. 1963).    *State* v. *Reynolds,* 41 N. J. 163
(1963), cert. den. 377 U. S. 1000 (1964).    *Murphy* v. *City of New
York,* 273 App. Div. (N. Y.) 492 (1948).    *Kiracofe* v. *Common-
wealth,* 198 Va. 833 (1957).    *State* v. *Wilson,* 1 Wash. App. 1001
(1970).    *Banas* v. *State,* 34 Wis. 2d 468 (1967), cert. den. 389 U. S.
962 (1967).

past delinquencies.  It follows that our inquiry in the instant case must be whether the juvenile records of the witness had a rational tendency, as in the *Davis* case, to show bias of the witness.  For that purpose we must examine the facts of the *Davis* case as they related to the juvenile witness involved in that case.

Davis was charged with grand larceny and burglary; the larceny involved a metal safe.  The broken safe was found abandoned near Green's home about twenty-six miles from the scene of the burglary.  Green told the police of seeing two men and an automobile at the place where the safe was later found, and that one of the men had a crowbar.  He identified a picture of Davis as one of the men, and later picked Davis out of a lineup.  At the time of trial and at the time of the events Green testified to, he was on probation by order of a Juvenile Court after having been adjudicated a delinquent for burglarizing two cabins.  Green was questioned at the trial as to whether he had ever been interrogated by any law enforcement officers.  He answered, "No"; the answer was characterized by the Supreme Court as "highly suspect at the very least."  415 U. S. at 314 (1974).

The Commonwealth argues that there are significant differences between the facts in the instant cases and in the *Davis* case.  The Commonwealth stresses that Green's juvenile record was for the same type of crime (burglary) as that charged against Davis.  In contrast, the juvenile witness in the instant cases was never involved in an offense like that charged against Ferrara and Benjamin (murder) or any crime of violence, but rather was charged on several occasions with breaking into a building, and other nonviolent offenses.  The argument proffered by the Commonwealth is that Green was thus more likely than the juvenile in the instant cases to think that he was a suspect in the crime.  Further, the Commonwealth says, there was other evidence tending to show that Green was interested in deflecting suspicion

from himself, because the safe was found near his home. The Commonwealth also points out that Green was on probation and could be found to be susceptible to police pressure; that the juvenile here, unlike Green, was cross-examined extensively, and that the cross-examination included inquiries as to prior misconduct not involving adjudications of delinquency.[3]

We believe that the considerations which impelled the result reached in the *Davis* case are paralleled in the instant cases. DeWolfe testified that he was present at the scene of the crime when it was committed. The possibility of excessive desire by DeWolfe to please the police and prosecutor was present. Although DeWolfe was not an active probationer,[4] as Green was, DeWolfe was taken into custody three days after the crime was committed and was still in custody at the time of trial of these cases. The witness here ran away from the scene of the crime and hid from the police, and, like Green, he well may have insulated himself at the trial from questioning about his prior troubles with the police by what could be found to be a dissembling answer to a question

---

[3] The Commonwealth quite rightly stresses the broad extent of cross-examination permitted by the judge on the bias issue as well as others. If this matter were not of constitutional proportions, as established principally by the *Davis* case, we might well hold that the judge was clearly acting within his sound discretion in limiting the examination by excluding use of the juvenile record on the bias issue. The dissenting opinion of Mr. Justice White (joined by Mr. Justice Rehnquist) in the *Davis* case emphasizes that the Supreme Court has extended a constitutional principle in a manner that probably could not have been anticipated by the trial judge: "Yet, the Court insists on second-guessing the state courts and in effect inviting federal review of every ruling of a state trial judge who believes cross-examination has gone far enough." 415 U. S. at 321 (1974).

[4] The judge found that "the witness DeWolfe, at all times material, was *not* on probation," and we have accepted this finding. The record before us gives indication that DeWolfe *was* on probation during the material times. In any event, as shown by DeWolfe's other involvements with the law as we have summarized them, it is not crucial whether he was on probation.

which asked him why he ran away. ("I don't recall because I was worried about other things, bigger things than this little . . . [trouble]." Earlier, he said, he was worried whether George Pratt was alive.)

In brief, as in the *Davis* case, here we have a crucial witness, presented by the prosecution, who had a record of relatively serious delinquencies, and access to that record was denied to the defense. All the circumstances, including the flight of the witness from the scene, tended to support an inference that the young witness may have been motivated in his testimony by anxiety to please the authorities and fear that he himself would be accused of the crime. Depriving the defense of the relevant record prevented full cross-examination, and ultimate argument, as to the state of mind of the witness. Speculation, in hindsight, as to whether the result of the cases would have been different if the juvenile record had been made available, is not determinative. What is determinative is that, if the witness DeWolfe had been an adult, the defendants would have had an unqualified right to have the record for use in cross-examination on the issue of bias. In these circumstances, in considering "[t]he tension between the right of confrontation and the State's policy of protecting the witness with a juvenile record," *Davis* v. *Alaska,* 415 U. S. 308, 314 (1974), the latter consideration must yield.

The Supreme Court has held that this result is constitutionally required because the right of confrontation and cross-examination, especially in the area of bias and interest of the witness, is crucial to ensure a fair trial. "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Four-

teenth Amendment's guarantee of due process of law." *Pointer* v. *Texas*, 380 U. S. 400, 405 (1965). See *Alford* v. *United States*, 282 U. S. 687 (1931); *Greene* v. *McElroy*, 360 U. S. 474 (1959); *Smith* v. *Illinois*, 390 U. S. 129 (1968). "[W]e conclude that the State's desire that Green [the juvenile] fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of petitioner to seek out the truth in the process of defending himself. The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Davis* v. *Alaska, supra,* at 320.

2. Contrary to the argument of the defendant Benjamin, the judge properly submitted the crime of manslaughter to the jury as a possible verdict. We agree that it would have been error for the judge to charge on manslaughter if there was no basis for the charge. *Commonwealth* v. *Kinney*, 361 Mass. 709 (1972). The defendant Benjamin argues that no view of the evidence supported a verdict of guilty of manslaughter, even if it were conceded that a verdict of guilty of murder was warranted.

An inference was warranted that the crime was manslaughter. The witness DeWolfe, who claimed to have seen the shooting, in answer to a question with regard to where the rifle was pointing, answered, "I don't think they were aiming at him." This, together with other evidence permitted an inference that the defendants in shooting were continuing a program of harassment and intimidation of Pratt with no intent to kill or injure him. This in turn permitted an inference of recklessness on the part of the defendants, and supported the verdicts of involuntary manslaughter. See *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944). We need not decide whether the evidence also permitted a verdict of voluntary manslaughter, since, in determining that the manslaughter issue was properly submitted to the jury on at

least one basis, we have disposed of the crucial issues, viz.: that the guilty verdicts were supported by the evidence and the defendants are at best now entitled to a new trial, rather than judgment of not guilty.

3. The defendant Benjamin argues that his motion for a directed verdict should have been allowed by the judge. There was no error. There was evidence that Benjamin and Ferrara watched Pratt arrive near 163 Orton-Marotta Way, and Ferrara said to Benjamin, "Here comes a nigger"; that both men threw a bottle at Pratt; that a short time later the two men were seen standing close together on a roof, and Ferrara fired the fatal shots from there; that earlier that evening the two men were seen shooting out street lights, and Benjamin was using a rifle on that occasion. Although there was no evidence that Benjamin fired any shots at Pratt, clearly an inference was warranted that Benjamin and Ferrara participated in a joint enterprise which resulted in the death of Pratt. It could be found that both possessed the rifle; that both participated in a campaign of harassment of Pratt, and stood close together in continuation of that plan as the shots were fired. Cf. *Commonwealth* v. *Benders,* 361 Mass. 704, 707-708 (1972), and *Commonwealth* v. *Michel,* 367 Mass. 454, 456-459 (1975). There was competent evidence comprehending all the necessary elements of the offense, and therefore the cases were properly submitted to the jury. See, e.g., *Commonwealth* v. *Campbell,* 352 Mass. 387, 398 (1967); *Commonwealth* v. *LePage,* 352 Mass. 403, 419 (1967); *Commonwealth* v. *McCauley,* 355 Mass. 554, 559-561 (1969); *Commonwealth* v. *Rembiszewski,* 363 Mass. 311, 320-321 (1973); *Commonwealth* v. *Caine,* 366 Mass. 366, 374-375 (1974); *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 745-747 (1975).

*Commonwealth* v. *Perry,* 357 Mass. 149 (1970), relied on by the defendant Benjamin, in which this court held that a directed verdict should have been granted to the defendant, is not helpful to this defendant here. In the

*Perry* case, unlike the cases here, the defendant was shown to have been in the company of other participants before and after an armed robbery, but no evidence was shown of his presence at the time and place of the crime.

4. The defendant Ferrara asserts errors in the manner in which the Commonwealth sought to impeach its own witnesses by proof that they made prior inconsistent statements. Specifically, this defendant says that the Commonwealth was allowed to present impeachment testimony through other witnesses without first having complied with the necessary prerequisites of G. L. c. 233, § 23. That statute provides that before a party may impeach his witness with proof of prior inconsistent statements "the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them." As to certain of the alleged errors, it is not likely that they will arise at a new trial, at least in the precise way they are presented at this time. It is sufficient for us at this time to emphasize relevant principles which may well be important at a new trial. Some of these matters do involve alleged failure of the Commonwealth to inform certain witnesses of time, place, and content of statements before presenting contradicting testimony. See *Goodney* v. *Smith*, 354 Mass. 734 (1968).

Regarding one of the witnesses introduced by the Commonwealth, Sharon Lovely, the requirement of information as to the circumstances of making the statement was particularly relevant, and particularly a matter of dispute, because the witness had talked to the police on more than one occasion. The defendant Ferrara contends that the time element, and the possibility of the statement having been made on some occasion other than the one mentioned by the prosecutor in the questioning of the witness, were not brought to the attention of the witness. We add only that this may be a relevant consideration for the judge at a new trial.

The defendant Ferrara argues also, with a measure of persuasiveness, that some allegedly contradictory statements of Miss Lovely were introduced through a police witness, although the statements had not been mentioned at all in the examination by the Commonwealth of Miss Lovely. Again we observe that this may be a matter of concern for the judge at a new trial, particularly in a case where, after challenging its witness as to one or a few allegedly contradictory statements, the Commonwealth seeks later to introduce collateral evidence of the contradictory statement in a form substantially broader in content than indicated in the previous inquiry.

In addition, the defendant Ferrara argues that, in noncompliance with the statute, the witness Ellen P. Meeken introduced by the Commonwealth was given no opportunity to explain an alleged inconsistency. The Commonwealth replies, correctly we think, that no explanation is possible where the witness unequivocally denies making the statement. We comment, as we think is justified by the record before us, that care must be taken to ascertain that the denial is in fact unequivocal before it is considered that no privilege of explanation is due the witness. Obviously, there can be many shades and varieties of partial denials, and the witness is not afforded opportunity to explain, as required by the statute, if the examination is cryptic and incomplete in nature.

5. The defendant Ferrara contends also that there was error in the sequence wherein the prosecutor asked Miss Lovely, whom the Commonwealth had introduced as a witness, if she had told either Mrs. Pratt or Willie Mae Pratt that she knew who had committed the crime, and she replied "No." The Commonwealth later introduced Willie Mae Pratt as a witness, and she, over objections and exceptions of the defendants, was allowed to testify that Miss Lovely had told her that Ferrara and Benjamin had shot George Pratt. The testimony was limited to impeachment only. The defendants each moved for a mistrial, the motions were denied, and exceptions saved.

Clearly this sequence raises a difficulty under G. L.
c. 233, § 23, since Miss Lovely was never asked specifical-
ly if she had given to Willie Mae Pratt the names of the
men who shot George Pratt. However, the difficulty
goes deeper than that. No evidence was presented at any
time to show that Miss Lovely had witnessed the shooting
or that she claimed to have witnessed the shooting; the
Commonwealth's contention as to her observations and
knowledge was only that she had sold a rifle to Benjamin
at some time before the shooting. Under the stated
purpose of establishing an inconsistent prior statement of
Miss Lovely, the Commonwealth thus, through the testi-
mony of Willie Mae Pratt, was able to ascribe to Miss
Lovely the expression of an opinion which Miss Lovely
could not, without more, have been allowed to include in
her testimony. Thus, if the content of Miss Lovely's
allegedly inconsistent statement to Willie Mae Pratt had
been offered substantively at the trial through Miss Love-
ly's own testimony it would have been, without further
foundation, an expression of an inadmissible inference on
her part or a repeating of inadmissible hearsay. See
*Commonwealth* v. *Pleasant,* 366 Mass. 100, 102-103
(1974). Given the crucial and prejudicial nature of the
statement attributed to Miss Lovely, the testimony of
Willie Mae Pratt clearly was not an appropriate means
merely to establish this as an inconsistent statement by
Miss Lovely as to a collateral matter. Nor should we
conclude that the instructions of the judge, which limited
the statement to impeachment purposes, sufficiently
protected the defendants from such a highly prejudicial
statement.

Since a new trial is necessary on other grounds as
shown above, we need not consider this assignment of
error further, except to say that it, too, might well have
required reversal and a new trial.[5]

---

[5] It will also be unnecessary for this court to consider other appeals
of the defendant Ferrara which have been entered in this court, and
which claim review of the trial judge's denial of Ferrara's motions for

6. Other assignments of error argued by the defendant are not likely to recur at a new trial and require no discussion. The judgments are reversed. The defendants are entitled to have the verdicts of acquittal of murder recorded. They are to have a new trial for a crime which is to be no greater in degree than manslaughter. *Commonwealth* v. *Burke,* 342 Mass. 144, 148-149 (1961).

*So ordered.*

a new trial. These motions were heard and denied by the trial judge after the instant appeals had been entered in the Appeals Court and the record prepared therein. The appeals were then transferred to this court on our motion. On motion of Ferrara at oral argument before this court, we considered the record and findings of the new trial proceedings, after ordering those documents to be transferred to this court also.

The issues raised on the motions for a new trial are also raised in the instant cases. In light of the decision in the instant cases, it is unnecessary for us to consider the additional appeals, and by separate order of the full court we are treating those appeals as waived by the parties, and are ordering that they be dismissed.