COMMONWEALTH *vs.* ARTHUR A. BEMBURY.

Suffolk. October 3, 1989. - January 25, 1990.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Homicide. Witness*, Bias, Impeachment. *Constitutional Law*, Confronta-
    tion of witnesses. *Evidence*, Juvenile delinquency, Impeachment of wit-
    ness, Prior conviction. *Practice, Criminal*, Retroactivity of judicial
    holding, Instructions to jury. *Malice.*

The defendant at a murder trial held in 1971, who sought and was denied,
    properly at that time, access to the juvenile record of the Common-
    wealth's main witness, was not denied his constitutional right to con-
    front that witness, where the juvenile record had no rational tendency
    to show that the witness was biased, the purpose for which the defend-
    ant had sought the record. [556-561]
No error appeared at a murder trial from the judge's allowing the defend-
    ant's credibility to be impeached by evidence of his prior criminal con-
    victions. [561-562]
At a murder trial where the sole issue raised by the defendant was the
    identity of the murderer, any error in the judge's use of the word "pre-
    sumption" in his instructions to the jury regarding malice was harmless
    beyond a reasonable doubt. [562-563]
The judge's instructions at a murder trial, taken as a whole, presented the
    matter of reasonable doubt in an acceptable manner. [563-564]

INDICTMENTS found and returned in the Superior Court on
April 13, 1970.

The cases were tried before *Wilfred J. Paquet,* J.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Charles W. Rankin* for the defendant.

*Laura Callahan Burnham,* Assistant District Attorney, for
the Commonwealth.

GREANEY, J. On June 29, 1971, a jury in the Superior
Court convicted the defendant of the murder in the second
degree of Louise Simmons (on an indictment which charged

him with murder in the first degree), and unlawfully carrying a firearm. The defendant filed a timely appeal from both convictions. A subsequent motion for a new trial was heard and denied. The order denying the motion for a new trial has not been appealed.

Represented by new counsel on appeal,[1] the defendant argues that a new trial is necessary because the judge erred in (1) refusing to allow his trial counsel to suggest bias on the part of Faye Simmons, the principal witness against him, by disclosing her juvenile record to the jury; (2) permitting his impeachment by prior criminal convictions; and (3) improperly instructing the jury on malice and reasonable doubt. As the offense resulting in the defendant's conviction of murder in the second degree occurred before July 1, 1979, review under G. L. c. 278, § 33E, is appropriate. See *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980). We find no basis to order a new trial and no occasion to grant relief under G. L. c. 278, § 33E. Accordingly, we affirm the defendant's convictions.

We recount the principal evidence presented by the prosecution and the defense.

1. *The Commonwealth's case.* In February, 1970, Faye Simmons (Faye) was fourteen years old, and was living with her father, Alexander Simmons, and the victim, her mother, Louise Simmons, at 37 Schuyler Street in the Roxbury section of Boston. Faye and the defendant, nicknamed "Keetie," had been boy friend and girl friend for about six months.

---

[1]Consideration of the defendant's appeal in this court was delayed when he escaped in 1974, while on a furlough from the Massachusetts Correctional Institution, Norfolk. The defendant fled to California where he lived under an assumed name for the next fourteen years, eventually being apprehended and returned to Massachusetts. The Commonwealth made no motion in the interim to dismiss the appeal because of the defendant's escape. As a result, there is no occasion to consider the criteria for reinstating a criminal appeal which has been dismissed as the result of the defendant's having become a fugitive. See *Commonwealth* v. *Hurley*, 391 Mass. 76, 78-80 (1984). See also *Commonwealth* v. *Cook*, 380 Mass. 314, 316 (1980). The Commonwealth does not argue otherwise.

Her mother did not approve of Faye's keeping company with the defendant.

On Sunday, February 8, 1970, the day before Louise Simmons was murdered, the defendant visited Faye at 37 Schuyler Street. The defendant and Faye discussed breaking off their relationship but agreed to talk again. Their conversation concluded with Faye stating that she would call the defendant the next day, February 9. On February 8, Faye advised her parents that she would not be seeing the defendant again.

Faye did not call the defendant on February 9. This led to the defendant's calling and asking her to meet him at 6 P.M. at a café near her home. At first, Faye refused to meet the defendant, but she eventually agreed to see him just to get him off the telephone. She did not meet the defendant, nor did she talk with him again that day. Instead, she remained at home with her parents. Faye's father left for work about 3:40 P.M. When he left, Mrs. Simmons was "in good condition."

At about 5:45 or 6 P.M., the defendant called and Faye's mother answered the telephone. Five to ten minutes later, Faye heard the front doorbell ring. Faye was standing by the kitchen near the back of the house because she was planning to leave by the back door. When the doorbell rang, she went to the hall. From her position, Faye could not see the front door. Faye heard a door open and then heard her mother say, "It's Keetie." She recognized the defendant's voice, asking to speak with Faye. Faye's mother said that Faye did not want to see the defendant. The defendant then said, "Well, I want to see her." Mrs. Simmons said, "Well, she doesn't want to see you."

Faye could not understand the conversation that followed. She heard some movement, "like a stumble," coming from the porch. Faye's mother said, "Well, you just shoot then!" Faye heard a shot, and her mother calling her name. Faye immediately heard another shot. Her mother again called "Faye."

Faye went for help to a neighbor, who called the police. Officer Vincent D. Kelley of the Boston police department and his partner responded to Schuyler Street. There, Officer Kelley saw a man running into an alley. This man was stopped by Kelley, who approached him with his service revolver drawn.

Officer Kelley told the man, the defendant in this case, to stay where he was. The defendant had his hands in his pockets, and he was told by Kelley to put his hands in the air. The defendant raised his hands but then put them back into his pockets and appeared to fumble for something. The officer cocked his revolver and yelled for the defendant to put his hands back up in the air. The defendant did so.

Officer Kelley searched the defendant. He found a .22 caliber revolver in the defendant's pocket. The defendant was placed under arrest. The defendant said, "There was a shooting up the street." When the officer asked, "Where?," the defendant answered, "In the street, in the gutter." The defendant gave no address to identify the place of the shooting.

Officer Kelley handcuffed the defendant's left hand to his right hand. He then opened the defendant's revolver and took out five live rounds and two spent shells. The officer was eventually directed to 37 Schuyler Street, where he found Mrs. Simmons seriously wounded.

While he was still at 37 Schuyler Street with the defendant, Officer Kelley went into the kitchen. Faye was there; she grabbed a kitchen knife and went after the defendant. Kelley pulled out his night stick and knocked the knife from Faye's hand. Faye asked the defendant why he did it. The defendant said, "But I love you." She then went up to the defendant and put her arms around him, and said, "Sorry it had to end this way."

Mrs. Simmons died of gunshot wounds later than night. A ballistics test confirmed that two bullets found in Mrs. Simmons' body had been fired from the revolver taken from the defendant.

2. *The defendant's case.* The defendant testified in his own defense. He recounted his relationship with Faye, who he

thought was eighteen or nineteen years old. The defendant testified that on Sunday, February 8, he went to Faye's house and informed Faye that he was not coming back again. She asked him why and he did not give a reason.

On February 9, the defendant and Faye spoke again by telephone about the termination of their relationship. He eventually went to 37 Schuyler to talk with her about the problem.

The defendant went to 37 Schuyler Street and rang the doorbell. No one answered. He testified that the door was closed, but not locked. He rang the doorbell again. According to the defendant, he placed his hand on the door and found it open. The defendant went inside and saw Mrs. Simmons lying across the vestibule. He testified that he called, "Mrs. Simmons," twice, but that she did not respond. He then called, "Faye, Faye." He testified that he knew Mrs. Simmons had been hurt, but he did not know that she had been shot. The defendant saw a revolver lying on the floor about three feet from the body. He picked the revolver up, because he was scared, left the house, and ran down the street.

According to the defendant, he was apprehended shortly thereafter by Officer Kelley. The defendant told Kelley that a woman had been hurt and directed Kelley to 37 Schuyler Street. The defendant and Officer Kelley entered the Simmonses' house, walked past where Mrs. Simmons was lying, and went into the kitchen.

The defendant indicated that Faye came into the kitchen through the back door. According to the defendant, Faye said, "Where is my mother?" She went to the front of the house, came back, and grabbed a kitchen knife. Faye tried to attack the defendant, but Officer Kelley disarmed her. Faye ran over to the defendant and threw her arms around him and said that she loved him. One of the police officers asked Faye if she had seen the defendant commit the crime. Faye said that she had not because she had been next door.

3. *Refusal of impeachment: Faye Simmons.* Defense counsel filed a pretrial motion to inspect Faye's juvenile record

with a view toward using the record to demonstrate bias on her part. The motion was denied, and counsel, as was the practice in 1971, took an exception. When Faye had completed her testimony, defense counsel again moved for access to her juvenile record. The motion was again denied. We now have that record before us. We also have a copy of the transcribed statement given by Faye to the police on the night of the murder and a transcript of her testimony before the grand jury.[2] The defendant argues that the judge's denial of access to Faye's juvenile record deprived him of the opportunity to cross-examine her on possible bias resulting in a violation of his constitutional right to confront the principal witness against him.

The judge's ruling expressed the view, prevalent at the time of the trial, that a juvenile record was strictly confidential and, therefore, could not be introduced in evidence. *Davis* v. *Alaska*, 415 U.S. 308 (1974), decided three years after the defendant's trial, changed that view. The *Davis* decision held that, if information contained in a juvenile record indicated that the witness's testimony may be the product of official pressure or inducement, a claim that the record was confidential cannot prevail over the defendant's right to use the record to impeach the witness for bias. See *Commonwealth* v. *Ferrara*, 368 Mass. 182, 189-190 (1975). The defendant relies on the *Davis* and *Ferrara* decisions in making his argument. There is some irony in the fact that the defendant, by escaping and eluding detection for fifteen years, has gained

---

[2]A single justice allowed the defendant's motion to expand the record to include Faye's juvenile record in a supplemental appendix. The Commonwealth subsequently moved to expand the record further to include Faye's transcribed statement to the police on the night of the incident and her grand jury testimony. The defendant objects to the Commonwealth's motion to expand the record. We have considered the defendant's arguments and allow the Commonwealth's motion. Fairness requires that the Commonwealth be allowed to contradict the defendant's argument based on an appellate record which he has been allowed to expand. We consider the district attorney's representations as to the authenticity of Faye's statement to the police and her grand jury testimony as sufficient to establish the reliability of these materials when considered with various indicia of authenticity contained in the materials themselves.

the advantage of arguing that a change in the law requires a new trial. Nevertheless, the defendant is entitled to consideration of the issue because his experienced trial counsel carefully preserved the issue for appellate review and because the defendant's direct appeal has remained pending. See note 1, *supra*; *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).[3]

The *Davis* and *Ferrara* decisions fashioned a general rule on the use of a juvenile record to show bias, but they did not provide a defendant an absolute right to impeach a witness by proof of past delinquencies. See *Davis* v. *Alaska, supra* at 321 (Stewart, J., concurring); *Commonwealth* v. *Ferrara, supra* at 186-187; *Commonwealth* v. *Santos*, 376 Mass. 920, 924 (1978). When the issue arises, the principal inquiry is whether the witness's juvenile record has a rational tendency to show bias on his or her part. *Commonwealth* v. *Ferrara, supra* at 187. If the record has no such tendency, it is not error to exclude it.

In deciding the issue several considerations may apply. First, does the record disclose the commission of "relatively serious delinquencies?" *Commonwealth* v. *Ferrara, supra* at 189. Second, are those delinquencies recent enough to support an inference of bias? *Commonwealth* v. *DiRoma*, 5 Mass. App. Ct. 853, 853-854 (1977). Third, what do the facts show with respect to the probationary status of the witness, whether some suspicion focused on the witness, and the witness's motives to please the prosecution? *Commonwealth* v. *Santos*, 376 Mass. 920, 924 (1978). Fourth, did the witness prior to the delinquency furnish a pretrial statement or testimony consistent in material respects with his or her testimony at trial? *Commonwealth* v. *Haywood*, 377 Mass. 755,

---

[3]*Griffith, supra* at 328, holds that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clean break' with the past." We indicated in *Commonwealth* v. *Waters*, 400 Mass. 1006 (1987), that *Griffith* applies to all Federal constitutional claims, but not to State law claims. Since *Davis* expresses a Federal constitutional right, it would apply under *Griffith* to the defendant's direct appeal.

761-763 (1979). These considerations do not constitute an exhaustive list because, in the given case, other factors may also be relevant, such as the extent it was brought out to the jury that the witness may have had a dislike for the defendant and a motive to testify against him.

Faye's record in the Boston Juvenile Court discloses that she was twice adjudicated a delinquent child by reason of being a runaway (these adjudications were made on April 9, 1968, and on November 21, 1969). On September 1, 1970, she was adjudicated delinquent by reason of unarmed robbery, for which she was given a suspended sentence and assigned to the Youth Service Board and placed on probation until June 6, 1972. On May 21, 1971, she was found in violation of this probation. No final disposition of the probation violation appears on her record.

Faye's two incidents as a runaway child did not involve serious delinquencies and both cases were dismissed before the homicide occurred. These two adjudications would have had no logical tendency to show bias on Faye's part, and the defendant was not entitled to use them for that purpose.

Faye's adjudication as a delinquent by reason of her commission of an unarmed robbery did involve a serious offense which was committed seven months after the murder of her mother. Faye was also in violation of her probation for this offense when she testified at the trial. The value of this delinquency as possible evidence of bias has to be considered in light of Faye's statements about the crime that were given before the unarmed robbery. At 9:30 P.M. on February 9, 1970, the night of the murder, Faye gave a transcribed statement to a Boston police lieutenant in which she explained in detail her knowledge of the murder. On April 10, 1970, Faye testified before a grand jury and repeated to the jurors her knowledge of the incident. Both Faye's initial statement to the police, and her testimony before the grand jury, were given before she committed the unarmed robbery. In each of these pretrial accounts Faye identified the defendant as the person who came to the house and shot her mother. Further, Faye's testimony at the trial, with respect to the account of

the shooting, was detailed and consistent with the account of the shooting given in her initial statement to the police and in her grand jury testimony. The fact that Faye's trial testimony was the same in material respects pertaining to the shooting as her pretrial statement and grand jury testimony (both of which were furnished at a time when she lacked any motive to please the prosecution) satisfies us that the requested impeachment should not have been allowed.[4] See *Commonwealth* v. *Haywood, supra* at 761-763.

We add other considerations that are important. No contention was made at trial that Faye murdered her mother. Thus, at no time did suspicion focus on Faye. Further, through cross-examination defense counsel brought out that she had dislike for the defendant and motive to testify against him. Finally, the Commonwealth's case against the defendant was quite strong. Although that case depended on Faye's testimony, it was substantially strengthened by the defendant's possession of the murder weapon, his incriminating conduct after he left the scene of the crime, the over-all implausibility of his testimony, the lack of any other suspect,

---

[4]There were some inconsistencies between Faye's grand jury and trial testimony. One difference concerned which one of the two had initiated the break-off of the relationship. This point is relatively minor. There is also some disagreement over what was said by Faye to the defendant in the kitchen after the defendant's apprehension. The jury were given both versions of the meeting. Further, defense counsel brought out in cross-examination that Faye, in her prior testimony in the Roxbury District Court, had not mentioned anything said to her by the defendant in the kitchen. In view of this and the fact that Faye's account of the shooting was consistent, coherent, detailed, and extensive from her initial telling of it to the police through her trial testimony, we do not consider the discrepancy legally significant. Other inconsistencies, pointed to by the defendant, are inconsequential.

The defendant also argues that the lack of a final disposition on Faye's record on the unarmed robbery adjudication supports an inference that the authorities had given her favorable treatment. This inference has no basis in the record. For all we know, the violation of probation may have been left unresolved because the probation department of the Boston Juvenile Court decided not to press it in view of the murder or because Faye's behavior had improved to the point where further proceedings on the violation were considered unnecessary. Drawing inferences, one way or the other, from a bare record is not helpful.

and the testimony of other witnesses about his and Faye's behavior after the murder. We conclude that the defendant would not have been entitled to use Faye's juvenile record.

4. *Impeachment of the defendant.* Defense counsel objected to the defendant's impeachment by evidence of three prior convictions: two 1968 convictions, one of carrying a dangerous weapon (knife), and the other of the unauthorized use of a motor vehicle, and a 1969 conviction of unlawfully carrying an unloaded pistol. Acting on the basis of the law as it stood in 1971, the judge overruled the objection and allowed the impeachment. See *Commonwealth* v. *West*, 357 Mass. 245, 249 (1970) (stating that the word "may" in G. L. c. 233, § 21, "does not clothe the judge with discretion to receive or exclude this sort of evidence" when proffered by the cross-examining lawyer).

Since the date of the trial, decisions have modified the prior rule to hold that, notwithstanding the wording of G. L. c. 233, § 21, a judge has discretion to exclude a defendant's prior convictions if the possible prejudice that might arise from them exceeds their probative value. See *Commonwealth* v. *Knight*, 392 Mass. 192, 194 (1984); *Commonwealth* v. *Chase*, 372 Mass. 736 (1977). See also *Commonwealth* v. *Ruiz*, 400 Mass. 214, 215 (1987). The judge's decision to admit evidence of prior convictions will be reviewable on appeal. See *Commonwealth* v. *Maguire*, 392 Mass. 466, 470 (1984). Based on these decisions, the defendant now argues that permitting his impeachment by criminal convictions was reversible error.

We will assume, because of the objection made by defense counsel and the pendency of the defendant's appeal during these many years, that the defendant may raise the issue of his impeachment. We find no error in it.

The unauthorized use conviction bore no similarity to either charge on which the defendant was being tried. There was little chance that the jury might misuse that conviction. The 1969 conviction of unlawfully carrying a pistol was relevant to the defendant's testimony. On his direct examination, the defendant testified that he had last carried a handgun in

1968. The 1969 carrying conviction directly contradicted this testimony and suggested its falsity. Thus, the prosecutor was independently entitled to put the conviction in evidence to rebut the incorrect impression created by the defendant's testimony. The defendant's 1968 conviction of unlawfully carrying a knife was not similar to the crime charged of unlawfully carrying a firearm. The conviction was properly admitted.

Considering the impeachment in light of the judge's careful instructions to the jury on the use of the evidence only for the purpose of assessing the defendant's credibility, we perceive no error.

5. *Jury instructions: malice.* The defendant argues that the judge's instructions to the jury on the issue of malice aforethought created an improper mandatory presumption of malice, thereby abridging his right to due process. See *Commonwealth* v. *Callahan*, 380 Mass. 821, 823 (1980). In support of this contention, the defendant points to at least five instances where the judge used some form of the word "presumption" in his instructions on malice.

It has been established since the decisions in *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975), and *Sandstrom* v. *Montana*, 442 U.S. 510, 524 (1979), that the statement in jury instructions of any presumption — whether conclusive or rebuttable — that has the effect of shifting to the defendant the burden of proof of an essential element of a crime for which he is being tried violates a defendant's right to due process. The *Mullaney* and *Sandstrom* decisions are fully retroactive, see *Hankerson v. North Carolina*, 432 U.S. 233, 240 (1977), and the issue is available to a defendant whose defense counsel did not object to the questioned instructions. See *Commonwealth* v. *Stokes*, 374 Mass. 583, 588 (1978). However, it is also established that any error in the use of presumption language in jury instructions may be found harmless beyond a reasonable doubt if the commission of the crime is an issue which is not contested at the trial. See *Commonwealth* v. *Lee*, 383 Mass. 507, 512 (1981).

The latter principle governs this case. The fact that Louise Simmons was murdered was not disputed at trial. The sole issue raised by the defendant was the identity of the murderer. In the circumstances, we need not decide whether the judge's instructions on malice were flawed because the element of malice was not an active issue at the trial. See *Commonwealth* v. *Pisa*, 384 Mass. 362, 363 (1981).

6. *Jury instructions: reasonable doubt.* The defendant claims that the judge improperly instructed the jury on reasonable doubt and thus denied him due process. The defendant made a timely objection at trial. Specifically, the defendant points to the following language as constituting error: "If an unreasonable doubt or a mere possibility of innocence were sufficient to prevent a conviction, practically every criminal would be set free to prey upon the community. Such a rule would be wholly impractical and would break down the forces of law and order and make the lawless supreme." See *Commonwealth* v. *Madeiros*, 255 Mass. 304, 307 (1926).

We have said that a charge of this character, standing alone, is deficient because it warns of the consequences of holding the prosecution to too high a standard of proof without a counter-balancing warning of the harm to the defendant in holding the Commonwealth to too low a standard. *Commonwealth* v. *Spann*, 383 Mass. 142, 150 (1981). Without condoning these aspects of a *Madeiros*-type charge, we have upheld instructions containing similar language in several decisions. See *Commonwealth* v. *Tavares*, 385 Mass. 140, cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *Spann*, 383 Mass. 142 (1981); *Commonwealth* v. *Williams*, 378 Mass. 217 (1979); *Commonwealth* v. *Seay*, 376 Mass. 735 (1978). "It becomes a matter of reversible error [only] if the charge *as a whole* does not present the matter of proof beyond a reasonable doubt in a balanced way" (emphasis added). *Commonwealth* v. *Spann, supra* at 150.

The judge instructed the jury in an acceptable manner that the defendant was presumed to be innocent of the charges against him and that proof beyond a reasonable

doubt required proof to a moral certainty. See *Common-wealth* v. *Spann, supra* at 150-151; *Commonwealth* v. *Seay, supra* at 746. The judge's warning of the consequences of holding the Commonwealth to too strict a standard of proof was balanced by the statement that, "unless the evidence establishes facts which rest upon a more solid foundation than suspicion, guess work, speculation, conjecture, or even probability, the presumption of innocence must prevail." See *Commonwealth* v. *Sheline*, 391 Mass. 279, 296 (1984). Four times the judge expressly invoked the defendant's presumption of innocence, and on at least three occasions he mentioned the Commonwealth's burden of establishing the defendant's guilt beyond a reasonable doubt. "The judge's definition of reasonable doubt in terms of moral certainty, his repeated admonitions that the Commonwealth bore the burden of proving the defendant's guilt beyond a reasonable doubt, and his emphasis on the presumption of innocence which cloaked the defendant also helped to mitigate any negative effect of the judge's one-sided warning." *Commonwealth* v. *Sheline, supra* at 296-297. See *Commonwealth* v. *Tavares, supra* at 148; *Commonwealth* v. *Seay, supra* at 746; *Commonwealth* v. *Williams, supra* at 235. Because the charge taken as a whole presented the matter of proof beyond a reasonable doubt in a balanced way, we find no reversible error.

7. *Review under G. L. c. 278, § 33E.* Beyond noting the fact that the defendant's conviction is subject to review under G. L. c. 278, § 33E, see *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980), the defendant makes no argument in his brief to support a conclusion that the entry of a verdict of a lesser degree of guilt is warranted. Nevertheless, we have reviewed the entire record and conclude that the jury's verdict of murder in the second degree is strongly supported by the evidence and is consonant with justice.

*Judgments affirmed.*