**Arthur A. BEMBURY, Petitioner, Appellant,**

v.

**Norman BUTLER, etc., Respondent, Appellee.**

No. 91–1816.

United States Court of Appeals, First Circuit.

Heard March 5, 1992.

Decided July 7, 1992.

Charles W. Rankin, with whom Rankin & Sultan, was on brief for petitioner, appellant.

Robert N. Sikellis, Asst. Atty. Gen., Criminal Bureau, with whom Scott Harshbarger, Atty. Gen., was on brief for respondent, appellee.

Before TORRUELLA, Circuit Judge, WEIS, Jr.* and BOWNES, Senior Circuit Judges.

* Of the Third Circuit, sitting by designation.

TORRUELLA, *Circuit Judge.*

Petitioner, Arthur A. Bembury, convicted of second degree murder in Massachusetts in 1971, appeals the denial of his habeas petition by the United States District Court for the District of Massachusetts. We affirm, holding that although the jury instructions given at his trial twenty years earlier [1] were violative of due process, the constitutional error was harmless beyond a reasonable doubt.

The facts as revealed and testified to at the trial were as follows. The prosecution claimed that in February of 1970, Faye Simmons was the fourteen year-old girlfriend of Bembury. At the time, Faye was living at 37 Schuyler Street, Boston, Mass., with her parents. On Sunday, February 8, 1970, Bembury visited Faye at her home where they discussed breaking up. Faye agreed to call Bembury the following day, February 9, after school, so that they could further discuss their relationship. Faye told her parents that she would not see Bembury again.

When Faye did not call Bembury on February 9, he called her home at about 5:45 or 6:00 p.m. Faye's mother, Louise Simmons, answered the phone and told Bembury that Faye did not want to speak with him. Five or ten minutes later, as Faye and her mother were preparing to leave home, the doorbell rang. Mrs. Simmons answered the front door. At the time, Faye was standing in the hall and could not see the front door, but she could hear the conversation. After hearing the door open, Faye heard her mother say, "It's Keetie." [2] Faye heard Bembury ask to speak to Faye, to which Mrs. Simmons responded that Faye did not wish to see Bembury. Bembury then said, "[w]ell I want to see her." And Mrs. Simmons again responded, "[w]ell she doesn't want to see you."

Faye then testified that she heard "like a stumble" coming from the porch and Mrs. Simmons saying, "[w]ell you just shoot then!" Faye heard a shot, followed by her mother calling her name. She immediately heard another shot, again followed by a call from her mother.

Officer Vincent D. Kelly of the Boston Police Department was on patrol with his partner when they responded to the call regarding the shooting. He testified that he observed a man run into an alley off of Schuyler Street. Officer Kelly stopped the man, later to be identified as Bembury. When ordered to take his hands out of his pocket and put them in the air, Bembury initially raised his hands then put them back in his pocket as though attempting to grab something. Bembury was again ordered to put his hands up and he complied. A search of Bembury revealed that he was carrying a .22 caliber revolver with two spent shells in his pocket. At least one of the bullets which hit Mrs. Simmons was determined to have been fired from the revolver. Bembury told the officers that there had been a "shooting up the street ... in the gutter." Upon further inquiry by the police, Bembury led the officers to 37 Schuyler Street, where Mrs. Simmons was found seriously injured. [3]

Officer Kelly further testified that he led Bembury into the kitchen. Faye was there. She grabbed a kitchen knife and proceeded to attack Bembury. Kelly knocked the knife from Faye's hand. Faye then asked Bembury why he did it, to which he answered, "[b]ut I love you." Faye then embraced Bembury and said "[s]orry it had to end this way."

Bembury testified on his own behalf at trial offering an alibi in his defense. His version of events was as follows. He claimed that on February 8 he informed

1. Bembury's appeal was delayed because after being convicted in 1971, he escaped while on furlough. He fled to California where he lived until his recapture fourteen years later. During this period, his appeal remained pending. Upon his return to custody in Massachusetts and exhaustion of his state court appeals, which affirmed his conviction, Bembury instituted the present habeas proceeding.

2. Testimony and evidence at trial showed that "Keetie" was a nickname used by Bembury.

3. Mrs. Simmons subsequently died from the bullet wounds.

Faye, while visiting her at her parents' home, that he wanted to stop seeing her and that he was not coming back. He testified that on the following afternoon, February 9, he went to Faye's house to further discuss their relationship. After ringing the front doorbell twice and getting no answer, Bembury notice that the front door was unlocked. He proceeded to open the door where he found Mrs. Simmons lying on the floor. He called her name twice, but she did not respond. He then called Faye twice, "Faye, Faye," but again got no response. At that point Bembury testified that he noticed a revolver lying on the floor near Mrs. Simmons. He picked the revolver up and ran down the street where he was apprehended by Officer Kelly. Bembury further testified that once he was taken to the Simmons' home Faye came in through the back door into the kitchen. When the police asked her if she had seen Bembury commit the crime, she said no because she had been next door at a neighbor's house.

Upon completion of the presentation of the evidence, the trial judge instructed the jury as follows:

> In the *Webster* case, which I referred to earlier, the Judge gave some clear and detailed instructions as to the full meaning of murder, and I quote again, 'Murder is the killing of any person against the peace of the Commonwealth with malice aforethought, either expressed or implied by law.' Malice in this definition is used in a technical sense, including not only anger, hatred, and revenge, but every other unlawful and unjustifiable motive. It is not confined to ill will towards one person, but it is intended to denote an action flowing from any wicked and corrupt motive, a thing done. *Malo animo* are Latin words meaning with bad intent where the fact that it be attended with such circumstances as carry in them the plain indications of a heart, regardless of social duty, and fatally bent on mischief, and therefore malice is implied from any deliberate or cruel act against another, however slight.

.    .    .    .    .

> I return to quote from the *Webster* case, The implication of malice arises in every case of intentional homicide, and the fact of killing, being first proved, all the circumstances of accident, necessity, or infirmity are to be satisfactorily established by the party charged unless they arise out of the evidence produced against him to prove the homicide and the circumstances attending it. If there are in fact circumstances of justification, excuse, or palliation, such proof will naturally indicate them, but where the fact of killing is proved by satisfactory evidence and there are no circumstances disclosed tending to show justification or excuse, there is nothing to rebut the natural presumption of malice. This rule is founded on the plain and obvious principle that a person must be presumed to do that which he voluntarily and wilfully does in fact do, and that he must intend all the natural, probable, and usual consequences of his own acts. Therefore, when one person assails another violently with a dangerous weapon likely to kill, and which in fact does destroy the life of the party assailed, the natural presumption is that he intended death or other great bodily harm, and as there can be no presumption of any proper motive or legal excuse for such a cruel act, the consequence follows that in the absence of all proof to the contrary, there is nothing to rebut the presumption of malice and the killing is murder.

.    .    .    .    .

> If you find that the defendant killed Mrs. Simmons, but you are not satisfied that there was deliberate premeditation, then since malice aforethought is implied from the cruel act of shooting and killing her, that would be murder in the second degree and that is the verdict you should return.

The jury was then sent to deliberate. We note that the jury was never instructed on manslaughter, nor was a manslaughter instruction ever suggested by the prosecution or the defense at trial. The trial was conducted on the theorem that a murder had been committed. Bembury's only de-

fense was his alibi, that he did not commit the murder.

After seven hours of deliberations, the jury asked the court to redefine second degree murder and to explain the difference between first degree murder and first degree murder with clemency.[4] The trial judge accordingly repeated his instructions. Upon further deliberations the jury returned its verdict, finding Bembury guilty of murder in the second degree and guilty of unlawfully carrying a firearm. He was sentenced to life imprisonment on the murder charge and to a concurrent sentence of two-and-one-half to three years imprisonment on the weapons charge. The conviction was affirmed by the Massachusetts Supreme Judicial Court in *Commonwealth v. Bembury,* 406 Mass. 552, 548 N.E.2d 1255 (1990), whereupon Bembury filed for habeas relief.

Although the District Court for the District of Massachusetts recognized that the instructions on malice given in Bembury's trial were constitutionally defective, it denied habeas relief, holding that the error was harmless beyond a reasonable doubt. Specifically, the district court reasoned that since malice was never at issue—the fact that Louise Simmons was murdered was never disputed—the faulty instructions could not have influenced the jury's decision. For this and other reasons discussed below, we affirm.

## DISCUSSION

■ During the interim of Bembury's escape and subsequent appeal, the Supreme Court, as well as this court, have repeatedly held that jury instructions similar to those given to the jury in Bembury's trial, which tend to shift the burden of proof as to an element of the crime charged to the defendant, to be unconstitutionally violative of due process. *See generally, Yates v. Evatt,* —— U.S. ——, 111 S.Ct. 1884, 1891, 114 L.Ed.2d 432 (1991); *Rose v. Clark,* 478 U.S. 570, 576, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986); *Francis v. Franklin,* 471 U.S. 307, 317–18, 105 S.Ct. 1965, 1972–73, 85 L.Ed.2d 344 (1985); *Connecticut v. Johnson,* 460 U.S. 73, 85, 103 S.Ct. 969, 976, 74 L.Ed.2d 823 (1983); *Sandstrom v. Montana,* 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975); *Hill v. Maloney,* 927 F.2d 646, 648 (1st Cir.1990);[5] *Doucette v. Vose,* 842 F.2d 538, 540 (1st Cir.1988); *Quigley v. Vose,* 834 F.2d 14, 15 (1st Cir.1987); *United States v. Winter,* 663 F.2d 1120, 1144 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983); *McInerney v. Berman,* 621 F.2d 20, 23 (1st Cir.), *cert. denied,* 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 85 (1980).

■ Where, as here, an instruction creates a mandatory presumption, even though rebuttable, due process mandates habeas relief, unless the error in giving the instruction is held to be harmless beyond a reasonable doubt. *Yates,* —— U.S. at ——, 111 S.Ct. at 1892 (citing *Rose v. Clark,* 478 U.S. 570, 582, 106 S.Ct. 3101, 3108, 92 L.Ed.2d 460 (1986)); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In making this determination the Supreme Court has adopted the test annunciated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under the *Chapman* test we must determine "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Yates,* —— U.S. at

---

**4.** Mass.Gen.L. ch. 265, § 1 (1971), reads in pertinent part: "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree."

**5.** In *Hill,* we held that an instruction taken from *Commonwealth v. Webster,* 59 Mass. (5 Cush.) 295, 304 (1850)—the same case used by the trial judge in instructing the jury in Bembury's trial—was unconstitutionally violative of due process in that it "conflicts with our present understanding of 'the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.'" *Hill,* 927 F.2d at 650 (quoting *Sandstrom,* 442 U.S. at 523, 99 S.Ct. at 2458).

——, 111 S.Ct. at 1892 (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828); *United States v. McMahon*, 938 F.2d 1501, 1505 (1st Cir.1991). This does not mean that in order for the error to be harmless beyond a reasonable doubt it must be shown that the jury was not aware of the erroneous instruction. *Yates*, —— U.S. at ——, 111 S.Ct. at 1892. Rather we must "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.* In other words, we must make a "judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption." *Id.* In doing so, we must 1) determine what evidence the jury actually considered in reaching the verdict; and 2) then "weigh the probative force of the presumption standing alone." *Id.* 111 S.Ct. at 1893. Succinctly stated, we must approach the issue objectively and ask "whether the force of the events presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." *Id.* Finally and unlike here, unless the erroneous presumption so narrows the jury's focus so as to preclude their consideration of the entire record before them, we must consider the entire record on appeal. *Id.* 111 S.Ct. at 1894.

■ Our analysis of the entire record before us leads us to but one conclusion; that the jury would have reached the same verdict irrespective of the erroneous burden shifting instructions.

The evidence considered by the jury is for the most part uncontradicted. Bembury did not present any evidence to discredit the State of Massachusetts' version of the events leading to Mrs. Simmons' death. He merely presented an alibi, claiming he was not the culprit. The question of intent was never raised. The jury heard Faye's account of the conversation between Mrs. Simmons and the assailant which Faye overheard. The trial was conducted from the posture that a murder had been committed. This is not to say that the State was relieved of its duty to prove every element of the crime. We think that the record as a whole, independent of the burden shifting instructions, shows beyond a reasonable doubt that a reasonable jury could have found that the shooting was committed with malice. Faye heard her mother tell the assailant "well you just shoot then!" This comment was followed by a shot, Mrs. Simmons' desperate cry for Faye and then another shot. It was reasonable for an objective juror to find malice in this case. More importantly, in light of the uncontradicted testimony regarding the actual shooting, the effect of the burden shifting instructions weighed against that evidence is minuscule.

In *Hill*, we examined the circumstances in which a defendant's failure to argue explicitly about malice or intent concedes those issues. *Hill*, 927 F.2d at 656. We suggested that in circumstances in which the evidence indicated a strong likelihood that the crime was committed with criminal intent, the defendant's failure to argue the issue of malice or intent might amount to a concession of those issues. *Id.* (citing *United States v. Winter*, 663 F.2d at 1144–45; *Krzeminski v. Perini*, 614 F.2d 121, 125 (6th Cir.), *cert. denied*, 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84 (1988); *United States v. Reeves*, 594 F.2d 536 (6th Cir. 1979); *Ross v. Israel*, 503 F.Supp. 131 (E.D.Wis.1980)). The circumstances of Louise Simmons' murder clearly "involved [an] obviously premeditated decision[ ] to commit [a] crime." *Id.* Bembury's failure to argue the issue of malice amounted to a concession of that issue, because, as in *Hill*, "intent was never put in issue, and indeed, could hardly have been contested." *Id.* (quoting *Ross*, 503 F.Supp. at 133).

There is virtually no likelihood that the jury applied the erroneous instruction, because there was ample evidence in the case on which the jury could have independently reached the conclusion that Simmons' murder was committed with malice. The jury made its determination independent of the malice instruction. We are confident beyond a reasonable doubt that the presump-

tions did not contribute to the jury's finding of Bembury's intent to kill Mrs. Simmons and ultimate guilt.

The judgment of the district court denying Bembury habeas relief is *affirmed.*